Melvin J. LANEY

v.

The UNITED STATES.

No. 130–80L.

United States Court of Claims.

Aug. 19, 1981.

Carl L. Shipley, Washington, D. C., for plaintiff. Thomas C. Henry, Washington, D. C., attorney of record. Shipley Smoak & Akerman, Washington, D. C., of counsel.

Gary W. Wilburn, Washington, D. C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D. C., for defendant.

Before NICHOLS, KUNZIG and SMITH, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This case was argued before *Deltona v. United States*, Ct.Cl., 657 F.2d 1184 and *Jentgen v. United States*, Ct.Cl., 657 F.2d 1210, and is decided simultaneously. The issues are to a large degree, but not wholly, the same. All three cases involve the extent to which government regulations limiting access between the land and navigable waters and the use of shore fronts and land that lies "between wind and water" constitute takings. To the extent to which the prior cases state the law here applicable, their reasoning is not repeated. This property, unlike that in the other cases, is an island. We seem to be confronted with an effort by the government to utilize its control over navigable waters to deny any meaningful access *to* the island whatsoever. The government's purpose appears to be, or *may* be, to keep it in its pristine state. The other properties are really not islands, in that for access *to* them, transit of navigable water is not necessary, so far as appears. Thus issues are presented here which the other holdings do not resolve. Both parties have moved for summary judgment. Both make contentions of law which, if sustained, would subsume all fact issues and make summary judgment appropriate. We reject these contentions of both sides and discuss the law to the extent necessary to show the reasons for our rejection. We try to avoid discussing the law which will apply to the facts that are yet to be developed.

I

Plaintiff, Melvin J. Laney, owns in fee simple Rodriguez Key, a 160 acre island located in the Florida Keys in Monroe County. Plaintiff asserts he acquired the island specifically to establish a primate breeding research facility for use in producing vaccines. Plaintiff further states that because of climatic conditions, this is the only site available in the United States for such use.

On July 9, 1978, pursuant to § 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and § 401 of the Clean Water Act of 1977, 33 U.S.C. § 1344, plaintiff filed a joint application to the Army Corp of Engineers (ACE) and the Florida Department of Environmental Regulation (DER). Plaintiff therein requested permission to discharge approximately 1,161 cubic yards of coral boulders into a sunken barge to form a concrete pier and to install a floating pier to connect the concrete pier to the island.

A public hearing was held on plaintiff's application on February 20, 1979, and on October 22, 1979, ACE denied the application. ACE found that although the pier would not obstruct navigation and "those portions of the proposed project which require[d] a Department of the Army permit would not directly be significantly adverse to the public interest, the proposed associated activity would be to the extent that the project is unsuitable for permitting." Environmental Assessment and Finding of Fact

on Corps Application Number 78M–1199 (October 22, 1979). In effect, ACE was not concerned with the effects of the pier on navigation or water purity, but with the effects of the development of the upland island on the environment. The ACE assessment includes this statement:

The proposed project area [*i. e.*, the island] is unsuitable for any public or private uses other than as it is now being used at the present [*i. e.*, no use at all].

ACE concluded "the alteration or destruction of any part * * * of this island is unnecessary and would be contrary to the public interest." ACE concluded that the facility was best suited for an upland site. Plaintiff did not contest the validity of the denial either before a district court or before us, nor does defendant tender this issue. On March 8, 1979, the DER issued an intent to deny plaintiff's application. Plaintiff states he is appealing that denial before the relevant state authority. Plaintiff thereupon filed suit in this court on March 19, 1980, alleging the denial of the permit by ACE constituted a taking.

It is a possible, if not the only, inference from ACE's assessment that it will use its licensing powers to prevent any use of the island whatsoever, even those portions, if any, that are upland, above mean high water. It is apparent, however, the ACE supposes the island includes no such upland, but is all located between mean high and mean low water. The ACE appears not to care whether there is any upland or not: its purpose is the same in either case. Certainly defendant's counsel here is indifferent to this issue. Counsel for the government, before us, boldly asserts a right pursuant to the navigation servitude to prevent any use whatsoever of the island, through its control over the only possible means of access. To hold the contrary would be, he says, to hold contrary to established precedent that a riparian owner possesses property rights in the use of the water, superior to the navigation servitude. Defendant alternatively calls attention to the existence in the district of a general license to construct wharves in navigable water out to not beyond the 6 foot depth line, below mean low water, not over 1,000 feet area, and not over 6 feet wide. It says plaintiff does not show either that this license has been revoked or denied, or is likely to be, or that such a generally licensed pier would not be adequate for either the intended use or for some unstated use.

## II

The plaintiffs in the *Deltona* and *Jentgen* cases, and here also, contended that defendant had taken their property because it frustrated their putting it to the "highest and best," *i. e.*, most profitable use. If this were a correct application of the law, plaintiff well might ask for summary judgment but *Deltona* and *Jentgen* have held it incorrect and we again reject it here. Plaintiff here also goes further and says it is denied opportunity to put its property to any remunerative use. That is a different case and one not so easily disposed of. It is one that is expressly excluded from the scope of those decisions where it is expressly held and determined that remunerative uses remained open to the aggrieved landowners after the alleged taking, regarding the properties in their entireties. Defendant, however, while claiming a right through the navigation servitude to deprive the owner of this island, and all other islands, from resort to *any* remunerative use, without payment of just compensation, denies that here it has done so. Such a proposition as that property, through a pier restriction, is denied any remunerative use, is not adapted to be established *pro* or *con* on summary judgment unless defendant expressly admits it. Whether defendant has denied plaintiff *any* remunerative use is, therefore, a fact issue requiring trial. That defendant might have it in its heart to do this and claims a right to is not enough.

## III

As we have said, the extraordinary contention defendant makes is that in the case of island property, any use that requires transit of navigable water for access, whether the use is of upland, or marginal

area below mean high water, is subordinate to and at the mercy of the navigation servitude. While air navigation is not an issue under the facts of this case, presumably the same alleged law would apply. If defendant is correct, the just compensation clause of the fifth amendment has but little effect in protecting island property. Defendant is free to add islands to its system of parks, national seashores, recreational areas, and wildlife preserves, without cost to it. We could enter summary judgment for defendant solely on the admitted fact that the property allegedly taken is an island. But defendant does not analyze the legal issues correctly and misconstrues the authority on which it relies.

This case and the *Deltona* and *Jentgen* cases differ respecting the access problem not in degree but in kind. Those cases involved the mode of developing Florida seashore real estate, that formerly flourished, whereby marshy shoreland was dredged and filled to produce complex patterns of deep channels and bulkheaded finger piers and solid ground. Such developments vastly enlarged the ability of the upland owner to exploit the proximity of his land to navigable water, and found eager lot buyers among yacht-having and other amphibious people, a rapidly growing class as our crowded harbors and marinas reveal. The developers were therefore seeking to improve their access *from* their land *to* navigable water in order to derive *from* navigation an added value. They had no need of navigable water for access *to* their upland property. Though the *Deltona* case involved a so-called island, no question was raised or involved of an owner needing a permit to get, *e. g.*, building supplies or construction equipment to his upland. With changing perceptions as to the effect of this kind of development on the environment, it was natural that the owner who sought to enhance navigation *from* and *to* his property, by dredging and structures between wind and water, should be required to get a permit from the authority that controlled the navigation, and should encounter increasing reluctance to grant such a permit.

The cases defendant relies on here are essentially the same in principle. That is to say, they are cases involving an upland owner who has access *to* his property through other upland, desires to enhance the value of the property by exploiting its common boundary (on one side) with navigable waters, and proposes to exploit that common boundary with economically beneficial uses, *e. g.*, water power development. It is in this context it is said that the upland owner has no property interest in the navigable water that is not subject to the navigation servitude. Defendant cites *United States v. Rands*, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967), holding that in condemning land along the Columbia River in connection with a lock and dam project, the owner could not recover special value of the land as a port site. A series of other cases are cited therein which defendant also cites here. They involve application of the same principle. They all concern access *from* the upland *to* the navigable water in order to enhance the financial return to the upland owner by exploitation of the navigable water. The island owner, however, being entirely surrounded by navigable water, relies on it for access *to* his property in order to use it in any manner, whether or not a use which exploits the navigable water itself. He could not use his upland to grow potatoes unless the government allowed prior use of its water or air to transport the seed, and the harvested potatoes would be useless if they could not be subsequently carried by water or air to a mainland market. If defendant has a right to make the island useless for potato growth by exercise of its navigation servitude, it must be by principles not involved (unless by semantic confusion) with the *Rands* case. The difference is that it is access *to*, not *from*, the island that defendant would terminate, and the access does not relate to the navigable water itself, but fundamentally, to the island upland, on the one hand, and the mainland upland, on the other. Access *to* the navigable water is not desired as an end in itself, but as the necessary means of access to the island from the mainland, or to the mainland from the island.

The law of eminent domain recognizes this distinction in the prefectly parallel case of a city block surrounded by public streets. It has always been held that where the owner has access *to* his property on one, two, or three sides, that his access *from* the property to a street on one side is cut off is not a taking, even if the economic fruitfulness of the block is substantially impaired. On the other hand, if his access *to* his block on all four sides is cut off, that is a taking, and if authorized is compensable under the just compensation clause. II Nichols, *Eminent Domain* (1980 ed.) 36.32[2]. In other contexts, that a deliberate cutoff of access by all feasible routes is a taking is well established in the decisions of this court. *Drakes Bay Land Co. v. United States*, 191 Ct.Cl. 389, 424 F.2d 574 (1970); *Pete v. United States*, 202 Ct.Cl. 1109 (1973); *Pete v. United States*, 209 Ct.Cl. 270, 531 F.2d 1018 (1976). While in the *Pete* case defendant ultimately prohibited all use of the vessels then involved, the taking was held to have occurred earlier when defendant took real estate necessary to access to them, 209 Ct.Cl. at 294, 531 F.2d at 1032–33. *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) is not directly in point inasmuch as defendant attempted to use the navigation servitude not to cut off access to property, but to require access. Nevertheless, it is noteworthy the Court states " * * * this Court has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation. * * * " *Id.* at 172, 100 S.Ct. at 388. We think the case is helpful in its indication that there is no special mystique in exercise of the navigation servitude that permits uncompensated takings when compensation would be required in other contexts.

The above discussion focuses on the issue of access *to*, but we do not now hold that the involved regulation is necessarily not a taking if access is not wholly cut off. The court will have to weigh the circumstances. The problem of when regulation becomes so burdensome as to constitute a taking is well discussed in the *Deltona* and *Jentgen* opinions to which we do not and could not add anything further that would be useful.

■ We hold, therefore, that defendant is not entitled to summary judgment on its motion because the known facts do not exclude, though they do not establish, the conclusion that defendant has effectively denied all meaningful access to the island, with the purpose and effect of preventing all economic use and holding it as a scenic preserve without paying for it.

Assuming that the breeding of primates on the supposititious upland, with the proposed pier to service the operation, do not involve either navigation or water pollution concerns, it is a moot question whether the effort to prevent it is an abuse of the ACE's statutory discretion. This question is moot in the actual posture of the case because, as stated, both sides assert that the regulatory decision involved is valid. On plaintiff's side, this means plaintiff must consider a valid commerce clause concern is somehow implicated, and we do not know otherwise.

Of course, the trier of fact will have to consider whether the general license is not a sham, and authorizes a pier which is adequate for the intended use, or some other economic use. The question is somewhat slighted by plaintiff, but defendant appears to believe that its denial of a special license is adequate, despite the general license, to frustrate the breeding of primates on the island, or any other economic use. Otherwise, its denial of the special license would be ineffectual to accomplish its desired end. The position of both parties needs clarification respecting the general license, and this obscurity is another stumbling block to the entry of summary judgment for either side.

The short of it is that the entry of summary judgment for either side, on the basis of admitted and established facts, would require us to subscribe to legal positions which we reject. To decide for plaintiff, we would have to decide that frustration of the "highest and best" (*i. e.*, most profitable) use by regulation, is per se a taking, and *Deltona* disposes of that. To decide for defendant, we would have to decide that

the navigation servitude affords defendant a handle to regulate or prohibit without compensation, any activity whatsoever that defendant disapproves of, on an island, that requires for feasibility access to the island by water (or by analogy, air) transport. Under any view of the law short of these inadmissible extremes there are relevant issues of fact requiring trial.

 We also emphasize that it is doubtless a relevant fact issue what use of the island is permissible under effective state regulations. It will not be possible to mulct defendant in substantial taking damages solely by reason of its frustration of uses not permissible under the state DER. We do not wish to speculate about possible uses other than the breeding of primates. The barring of specific uses by state zoning may relate to quantum rather than entitlement if defendant actually denied the special license of set purpose to bar *any* economic use, but zoning has not gone quite so far.

Accordingly, plaintiff's motion for summary judgment is denied, defendant's motion for summary judgment is denied, and the cause is remanded to the trial division for further proceedings.