**FLORIDA ROCK INDUSTRIES, INC.,**
Appellee/Cross-Appellant,

v.

**The UNITED STATES,**
Appellant/Cross-Appellee.

Appeal Nos. 85–2588, 85–2609.

United States Court of Appeals,
Federal Circuit.

May 14, 1986.

Fred R. Disheroon, Special Litigation Counsel, Dept. of Justice, Washington, D.C., argued, for appellant/cross-appellee. With him on the brief was F. Henry Habicht, II, Asst. Atty. Gen.

John A. DeVault, III, Bedell, Dittmar, DeVault, Pillans & Gentry, P.A., Jacksonville, Fla., argued, for appellee/cross-appellant. With him on the brief was C. Warren Tripp, Jr.

Ronald A. Zumbrun and Sam Kazman, Pacific Legal Foundation, Washington, D.C., were on brief, for amicus curiae.

Francis X. Bellotti, Atty. Gen. of Massachusetts, and Nancy S. Marks, Asst. Atty. Gen., Boston, Mass., were on brief, for amicus curiae, The Com. of Mass.

Before DAVIS, Circuit Judge, COWEN and NICHOLS, Senior Circuit Judges, and BALDWIN and BISSELL, Circuit Judges.

NICHOLS, Senior Circuit Judge.

This appeal from the Claims Court, 8 Cl.Ct. 160, confronts us with important and novel issues as to the application of the fifth amendment and, consequently, the Tucker Act, 28 U.S.C. § 1491, to measures by the Secretary of the Army, through the Army engineers under authority of the Clean Water Act, 33 U.S.C. § 1251(a)(1) and ff, to protect Florida wetlands against disturbance by the owner's limestone mining. At times, as by the holding below here, what were intended as mere regulations are converted by force of law into involuntary purchases called "takings." We have the benefit of amicus briefs supporting both sides. We consider it is not legally impossible that the regulatory measures here involved could be a taking, and not impossible that no taking occurred. The trial judge failed to apply the evidence in a manner correct in all respects to determine whether he had an actual instance of a taking before him. The mere existence of authority to regulate did not itself constitute the taking, and a regulation severely damaging an owner's expectations of realizing profit from his holdings, may not because of that necessarily be a taking either. We remand for determination of the taking question according to right principles, as it would be improper for us to constitute ourselves fact finders and weigh the evidence ourselves.

The act that allegedly constituted the taking, denial of a permit to discharge dredged or fill material into navigable waters and other waters of the United States, applied to but 98 acres out of a 1,560-acre tract, but the cross-appeal urges the whole 1,560 acres were taken because the action respecting 98 acres established a precedent that would govern the rest. This cross-appeal we deny. The award for taking 98 acres was $1,029,000 plus interest from a 1981 taking date. Anticipating that the cross-appeal might succeed, the trial court determined that the award for 1,560 acres would be $10,580,000 plus interest.

## Statement of Facts

The plaintiff/appellee company, Florida Rock Industries, Inc. (Florida Rock), is a large-scale miner of limestone, which it extracts for conversion into aggregates for the construction industry. Such aggregates are basic material for a variety of concrete products. There are large deposits of limestone in South Florida, but they are rapidly becoming unavailable owing to the rapid growth of the densely populated area. Florida Rock purchased the 1,560 acre tract in question in 1972, paying $2,964,000. The sole purpose was to obtain its limestone deposits for extraction, and no other use, or sale, has ever been considered.

The tract is in the portion of Dade County, Florida, that lies west of the city limits of Miami. Krome Avenue borders its western side and the Tamiami Trail (Route 41) is one and one-half miles to the south. The built-up western residential suburbs of Miami are growing rapidly in its direction, and industrial activity is already visible from the tract itself. The ground is wet, frequently flooded by the state in its control of the water supply, and is part of the Everglades according to the map, but excluded by road, canal, and levee construction. The area is criss-crossed with state-owned canals. The surface is, according to the trial judge, of attractive appearance with variegated vegetation, a habitat of redwing blackbirds, swallows, snipe, American egrets and heron, as well as fish. Defunct vegetation, matted and rotting, lies above the limestone. They are wetlands that recharge the Biscayne aquifer and filter and purify the ground water, if left undisturbed.

It is conceded that before the 1972 amendments to the Clean Water Act, *supra*, Pub.L. No. 92–500, Florida Rock had the local zoning classification requisite to allow it to mine the limestone and needed no consent by the Federal Government. The amendments followed the acquisition and, according to the trial judge, Florida Rock need not have foreseen them. Actually, because of a slump in the construction industry, Florida Rock allowed the land to remain untouched, though it paid the taxes on it, until 1978, and then commenced to mine. The Army engineers learned of this and stopped it with a cease and desist order. Florida Rock, on October 1, 1980, applied to the Army engineers for a section 404 (33 U.S.C. § 1344) permit to cover 98 acres only. This was estimated to suffice for three-years production, and the Army engineers refused to consider more. Florida Rock would have preferred a permit for the whole 1,560 acres, all of which it meant to mine eventually, but cut down the scope of the application to obtain consideration which would otherwise have been refused.

The Army engineers gave notice of the application to interested federal agencies such as the EPA, the National Park Service, and the Fish and Wildlife Service, to the state, and to Dade County. All urged objections focused primarily on the irremediable loss of wetland, and in the case of some, to water pollution in the form of temporary turbidity caused by the mode of mining proposed, the only feasible method Florida Rock knows of. This is to place a mechanism, called a "drag line," on solid ground, remove the muck overlay, dump it temporarily on the ground, remove the limestone thus made accessible with aid of blasting as necessary, dump some of the previously removed limestone or muck into the hole to make a solid foundation to which the "drag line" can be moved, and commence another phase. As the hole

would be filled with water, dumping the fill into it would produce temporary pollution by turbidity which, however, would not be a menace to the drinking water. Dade County, if the permit were to be granted despite its recommendation, would require controls to confine the turbidity to 50 feet. It is clear from the administrative file that the temporary pollution was of primarily legal importance as a source of federal jurisdiction, and the real concern was the threatened loss of valuable wetlands, which rendered a community service whose benefits extended far beyond Florida Rock's own property. The 98 acres, after removal of all limestone, would consist mostly of a deep lake or pond which, if environmentally harmless, was of no value either.

Dade County pointed out that Florida Rock would need various documents from it, including a Tree Removal Permit, and should make certain agreements with the county. The engineers, respecting their jurisdiction, pointed out that their definition of "waters of the United States" in 33 C.F.R. § 323.2(a)(3) includes "wetlands * * the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters."

Under date of October 2, 1980, after careful consideration, the district engineer determined that the permit would not be in the public interest, and denied it. His findings are our source of the facts stated above, which we take as given.

### Proceedings Below

This lawsuit in the Claims Court followed. The "liability" and "damages" phases of the litigation were severed according to immemorial custom of that court and its predecessor, the Court of Claims. The plaintiff introduced evidence of its investment in the property, its intentions respecting use of it for mining with its anticipated profit therefrom, and argued that, if the property could not be mined, it had no viable economic use whatever. The circumstances of the permit application and its denial were of course before the court. It appeared that since the permit denial there had been numerous inquiries about possible sale of the property by Florida Rock and one offer of $4,000 an acre. Florida Rock rejected everything, still wishing only to mine, and believing the property to be much more valuable than the offer, on the hypothesis, presumably, of either the restraints being lifted or the litigation resulting in the government's being held a taker. The value theory of Florida Rock was that the property before permit denial had a use value based on the owner's anticipated profits, and after the denial no "use value;" that fair market value subject to the restriction was a myth, potential buyers being made up of gullible persons, often foreigners, who would pay anything for acreage in South Florida, and more hard-eyed types who would also buy anything if the price was sufficiently trifling. Florida Rock offered, however, no testimony by real estate appraisers. It introduced testimony that the logic of denying the permit for 98 acres would preclude a permit for any other part of the tract.

The government produced a qualified real estate appraiser who testified that there was a fair market value remaining; he assigned $5,466,000 to the 1,560 acres in this case. The hypothetical willing buyers would not necessarily be fraud victims: he tried to disregard them though admitting they existed. The buyers would be aware that rock mining was effectively prohibited and that other development was likewise not then feasible. Their motivation would be a hope the regulation would change. Other government evidence was consistent. The Dade County assessed value for tax purposes was $4,157,800, but this was contested.

Since the oral argument, we have received from appellant's counsel copies of a decision of the District Court of Appeals of Florida, Third District, styled *Florida Rock Industries, Inc. v. Franklin B. Bystrom, Dade County Property Appraiser, et al.*, 485 So.2d 442 (1986). This material is on Lexis and Westlaw. Filed February 25, 1986, it reflects appellate and trial court affirmance of the action of the Dade Coun-

ty appraisers in assessing the 1,560 acres, the subject of the appeal before us, as of January 1, 1982, at a fair market value of $4,089,950. We do not consider it as evidence of any facts or as part of our record. We cite it, *infra,* as interesting and relevant case authority, though, of course, not a binding precedent in this court. Upon our remand, if this opinion is offered, the trial court will have to determine what use to make of it.

In an oral decision rendered from the bench, May 7, 1984, the court (Chief Judge Kozinski) determined that the permit denial promoted the public health and welfare; "we have to take it as given that this was a proper exercise of statutory and regulatory authority." Counsel assured him that there was no issue as to these matters in the case. "The Corps' denial of permit to rock mine the property advances a legitimate public purpose." The court responded: "If you were challenging that, you would be in District Court." He held that "the denial of the permit for the 98 acres was a taking because it left the plaintiff no reasonable economic uses for the property." He left open at that time whether the rest of the tract was taken. In general he accepted the testimony of the plaintiff's economics expert that there was no other viable use. He confirmed this with what he saw when he viewed the property and noted defendant's own appraisal expert's admission there was no residential demand in the wetlands area. He addressed the defendant's evidence there was a market among knowledgeable investors who accepted the fact they would not be able to use the property for a while, saying that the law looks to the uses it can be put to, and a possible sale to one accepting a period of idleness, but hoping for a future change in conditions, is too speculative. He remarked that the idea a sucker was born every minute had been superseded by the idea one could sell swamp land in Florida to someone at almost any time.

As he had promised, but a year later, May 6, 1985, the trial judge followed up with a written opinion, 8 Cl.Ct. 160 (1985). As it is published, we need not set it forth in detail; it enlarges upon and elaborates the oral conclusions for the most part. It finds that as of the time of permit application, Florida Rock had all the necessary permits from state and local officials. One feature is new. The opinion, to refute defendant's argument that the denial stopped threatened harmful pollution which could be done without compensating the would-be polluter, undertakes to show that in fact the anticipation that the pollution would occur was unfounded, and finds as a fact that the proposed mine would not have polluted the water supply. He had previously determined that the denial was "a proper exercise of statutory and regulatory authority" which it could hardly have been if the engineers had not reasonably anticipated that some pollution would occur, enough to warrant the exercise of federal jurisdiction at least. This part of the opinion therefore reflects a drastic change of position.

The trial as to damages was conducted before May 6, 1985. On May 7, 1985, the judge reassembled counsel to hear him state his conclusions orally on the "damages" phase, on which he had now heard a large amount of new evidence. He ultimately concluded that only 98 acres were taken. He rejected the plaintiff's evidence based on the profit anticipated from sale of the limestone expected to be extracted from the property and instead deduced a value from actual sales of other property in the same neighborhood, similar in containing limestone deposits, but different in that extraction of the limestone was permitted. He concluded the award for 98 acres should be $1,029,000, *i.e.,* $10,500 an acre including damage to the remainder of the tract. If, on appeal, it should be held the whole 1,560 acres were taken, the award would be $10,580,000, he found. Interest would run from the taking date, October 2, 1980, at rates established in the court's order. Defendant's obligation to pay is conditioned upon tender by plaintiff of a quit claim deed in proper form for the 98 acres.

## Discussion

Appellant/Defendant supports its appeal with three lines of argument, first, that the denial of the permit did not constitute a taking under the fifth amendment, second, that the court below engaged in an improper review of public interest factors, and third, that in establishment of the award the value of the property for rock mining should not be considered, *i.e.*, the property should be valued as already subject to the permit denial asserted to constitute the taking. We address defendant's second issue first because, in our view, it raises a threshold question as to the jurisdiction of the Claims Court which we should define before we go further.

## I

To repeat, the Claims Court reviewed the evidence and found as a fact that the proposed limestone mining would not pollute. This would appear to be an issue as to the jurisdiction of the Army engineers to regulate the activity in question. Under the authority relied on by them, 33 U.S.C. § 1344, permits can be required for discharge of pollutants, including rock and sand, *see* definition, 33 U.S.C. § 1362(6), into federal waters. It is clear from both the district engineer's decision denying the permit, and the government's brief and oral argument before us, that this is the sole basis in law for the Army engineers taking action. Absent pollution, as defined in the statute, the preservation or destruction of the instant wetlands would be a state or local issue only. The question of "public interest," as addressed in the district engineer's decision, is far broader and involves what he described as grave dangers to the environment over a wide area and not at all dependent on pollution. Should the plaintiff discover some means of removing the limestone without putting any rock or sand in government waters, the "public interest," as stated by the district engineer, would hardly be different at all if the wetlands were still eliminated. It was not contended the "pollutants" would be more than temporary turbidity, and the possible long-term harm by it would be minimal or nonexistent. One, therefore, must, in considering a document such as the district engineer's decision in issue, distinguish very sharply between "jurisdiction" and "public interest" considerations. Clearly the challenge by the court below to the possibility of pollution has to do with the jurisdiction of the Army engineers to grant or withhold the permit in question, not to the broad range of "public interest" issues considered and applied by them when they deem they have jurisdiction. The finding by the trial court that there would be no pollution therefore attacks indirectly the right of the engineers to apply their conception as to the far weightier "public interest" issue.

 Defendant further says, and we think it is indisputable, that the proper way to challenge the decision to grant or withhold the permit would be under the Administrative Procedure Act (APA), 5 U.S.C. § 702 and ff. If there was no pollution, even giving due weight to the contrary determination, as held in *Di Vosta Rentals, Inc. v. Lee*, 488 F.2d 674 (5th Cir.1973), *cert. denied*, 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974), then the Army engineers had no statutory authority to act. The Tucker Act suit in the Claims Court is not, however, available to recover damages for unauthorized acts of government officials. *Armijo v. United States*, 663 F.2d 90, 229 Cl.Ct. 34 (1981); *NBH Land Company v. United States*, 576 F.2d 317, 217 Cl.Ct. 41 (1978). What is meant by authority in these premises is aptly illustrated by *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922) where Army ordnance officers fired heavy coast defense guns over the plaintiff's hotel land. Justice Brandeis, dissenting, denied that the officers had authority to acquire an interest in hotel land, but Holmes, for the majority, held that whether they had authority to fire the guns was the decisive authority question. As to how authority is determined, *see also Armijo v. United States, supra*, and *Drakes Bay Land Co. v. Unit-*

ed States, 424 F.2d 574, 191 Cl.Ct. 389 (1970). In the instant case, therefore, the district engineer did not need authority to acquire the 98 acres he is held below to have acquired on behalf of the United States, but he did need, or rather plaintiff needed him to have, authority to regulate the proposed mining as a *de jure* pollution, however minimal, of federal waters. In *Armijo v. United States*, 663 F.2d at 93, the Court of Claims said of regulatory taking cases justiciable under the Tucker Act "[i]n such cases the characteristic feature is the defendant's use of *rightful* property, contract, or regulatory rights to control and prevent exercise of ownership rights the defendant is unwilling to purchase and pay for." [Emphasis supplied.] In stating, therefore, "we have to take it for granted that this was a proper exercise of statutory and regulatory authority" the court recognized the limits of his role in a taking case, and in assuring him that "the Corps' denial of permit to rock mine the property advances a legitimate public purpose" counsel stipulated that such an issue was not before the court for adjudication. Logically, a decision that there was no threatened pollution does not support an award of $1,029,000. It would support either a dismissal of the complaint or a transfer of the case to a court having APA jurisdiction.

■ In *Deltona Corp. v. United States*, 657 F.2d 1184, 228 Ct.Cl. 476 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982), the Court of Claims considered permit denial issues under the Clean Water Act, of the same general kind as here. The claimant, before its Court of Claims suit, had actually litigated its issues as to the validity of permit denial in an APA suit, and a United States District Court had upheld the denial in all respects. In that context, the court held that the propriety of the permit withholding was "given" in the Tucker Act suit. We now hold that the election of a Tucker Act suit, without a previous test of validity issues under the APA, accomplishes the same result because of the necessity of conceding the engineers' authority to act. In defending, the government may deny the authority and in that way authority could become an issue in a Tucker Act taking case.

■ Apart from the foregoing, the unexplained switch in the trial court's position appears improper under the Law of the Case doctrine. *Yachts America, Inc. v. United States*, 779 F.2d 656, 659–60 (Fed. Cir.1985); *Northern Helex Company v. United States*, 634 F.2d 557, 561–62, 225 Ct.Cl. 194 (1980); *United States v. Turtle Mountain Band of Chippewa Indians*, 612 F.2d 517, 519–22, 222 Ct.Cl. 1 (1979). He was identified, during his chief judgeship, with the practice of delivering orally from the bench opinions and fact findings in complex cases, saving time and conserving judge power. Often, as here, he undertook to answer questions so that his position would be thoroughly understood by counsel, and future proceedings in the case would be governed accordingly. The discussion here referred to occurred during such a question and answer period. The proceedings were recorded with care in the trial transcript. Between them and the retraction in the May 6, 1985, decision, the trial on damages occurred. We would not think of applying law of the case to mere colloquies between court and counsel, but this was more and different. We think that when an oral presentation by a judge is given the prominence it enjoyed here, it, or the transcript of it, should have the same dignity as written findings and conclusions would have if they existed.

A good deal is said in this case about the apparent indifference of the Army engineers and their advising agencies in the United States Government to the loss of a valuable asset on the part of Florida Rock, one in which substantial capital was invested. Whether or not able counsel ultimately extricate the government from becoming an involuntary purchaser, it would seem officials who have studied all other aspects of their exercise of regulatory authority with the care the administrative record reveals, would give some thought to that. They appear to have believed it was enough to tell Florida Rock it could get its

limestone elsewhere, disregarding the fact that in this tract it had invested its capital. Yet apparent official unwisdom does not make a constitutional violation. If one otherwise would have occurred here in the form of a taking without just compensation, it is cured by the Tucker Act and a more cautious construction of the Clean Water Act is not legally required. *Cf. United States v. Riverside Bayview-Homes, Inc.,* — U.S. —, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

Accordingly, the inquiry whether and finding that the proposed activity would not pollute, was erroneous. It requires vacating and remanding because we cannot tell to what extent it influenced the holding that the denial of the permit constituted a taking.

## II

We can, therefore, turn to the ultimate issue in this case, which is whether duly authorized and lawful acts of the Army engineers, denying a permit under 33 U.S.C. § 1344, constitute a taking and subject the United States to money liability in the Claims Court under the Tucker Act.

■ Defendant no longer argues, as it did below, if the regulation is lawful it cannot constitute a taking; in that event, it was once said it was not an exercise of the power of eminent domain but of the police power or some other different source of authority. This argument got its start in *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), much discussed below, in which the Kansas legislature, having determined that beer was an obnoxious and toxic beverage, prohibited its manufacture in the appellant's brewery, rendering the brewery, of course, of no value. While the court below deemed *Mugler's* precedential authority much abated, we may concede as a hypothetical, if Florida Rock produced on its tract a fluid as septic as Kansas then considered beer to be, and proposed to drain it into the Miami drinking water, this could be stopped without compensation. But the scope of permissible regulation has much increased since 1887

and it is no longer asserted that a regulation, by its very nature as a regulation, cannot be an exercise of eminent domain. The holding or plain implication of *United States v. Riverside Bayview-Homes, Inc., supra,* is that a regulation under the Clean Water Act can be a taking if its effect on a landowner's ability to put his property to productive use is sufficiently severe. *See* statement of Justice White, 106 S.Ct. at 459 n. 4. The Clean Water Act in its present form, of course, goes far beyond the concerns of navigation, and such concerns are not implicated in this case, but in any event, the effect of *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) is that the old "navigation servitude," often used to excuse what looked suspiciously like takings, is no longer available for that duty in regulatory taking cases. Defendant, however, invoked the navigation servitude to excuse a regulation under the Clean Water Act that completely denied to the owner of a small island, any economic use of it, but the Court of Claims in *Laney v. United States,* 661 F.2d 145, 228 Ct.Cl. 519 (1981) held that this could be a taking, and a summary judgment holding it could not be was denied. This court has held that a taking can occur by a valid regulation with no physical invasion. *Skaw v. United States,* 740 F.2d 932 (Fed.Cir.1984). Under these authorities, the question has got to be faced whether the impact of the regulation here involved was sufficiently severe under the facts, as undisputed or as found, and the unchallengeable legality in this proceeding of the regulatory act here involved, does not answer the question or even lead towards the answer. In *Laney,* too, the legality of the regulation under the Clean Water Act was conceded.

## III

■ The Supreme Court has recently restated its standards for determining when a regulation constitutes a taking. It says:

[W]e have eschewed the development of any set formula for identifying a "tak-

ing" * * * and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case. * * * To aid in this determination, however, we have identified three factors which have "particular significance:" (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the government action."

*Connolly v. Pension Benefit Guaranty Corp.,* — U.S. ——, ——, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986)

The fifth amendment, as backed by the safety net of the Tucker Act, does not find a taking in a mere denial of the "highest and best use," *i.e.,* most profitable use, that would be available in the absence of regulation. It was so held in considering a Clean Water Act regulation in *Deltona Corp. v. United States,* 657 F.2d 1184, 228 Ct.Cl. 476 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); *Jentgen v. United States,* 657 F.2d 1210, 228 Ct.Cl. 527 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982). The regulation may allowably have some adverse effect on the market value, as of course is almost inevitable if the most profitable use is prohibited. *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979); *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978). In cases of relatively recent date, *e.g., Penn Central, supra,* the decision of *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) is often referred to as an instance of truly spectacular reduction in value, from $800,-000 to $60,000, caused by the regulation, which was held valid. However, this was just an allegation, not a finding, and the case appears to belong to the period when it was held a valid "police power" regulation could not also be an exercise of emi-

nent domain. The case generally considered to have broken with this analysis came later: *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). In that case, Justice Brandeis' dissent cites *Mugler v. Kansas* and *Hadacheck v. Sebastian* and points out quite clearly how the Court is breaking with its precedents. There is no fixed formula to determine how much diminution in market value is allowable without the fifth amendment coming into play. We are not cited to, nor have we found, cases comparing the owner's investment or basis with the market value subject to the regulation and applying any rule or formula with respect thereto, but we deem that a relevant consideration for exercise of a value judgment.

The court below relied on statements that a regulation was a taking if it "denies an owner economically viable use of his land" citing *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.,* 452 U.S. 264, 296, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981); * *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). It found as a fact that such denial occurred. This finding seems not clearly erroneous only if immediate use is meant. Defendant's suggestion of other immediate uses we deem obviously mere window dressing in light of its own expert witness' concession that a "willing buyer" subject to the regulation would have to be, and would be, one who expected to put the property to no immediate use. The position of the court was that if there was, under the regulation, no allowable and practicable immediate use, this established a taking regardless of the impact of the regulation on fair market value, even if it had no impact. Defendant said and says that a fair market value was real and its indications should govern.

This issue could not become a genuine controversy in most other regulatory contexts. In the special locale of the property

---

* The Court cited *Hodel* for a proposition other than the portion of *Hodel* relying on *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), overruled in *Garcia*

*v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

involved, and special facts of this case, it does. Plaintiff offered no real estate appraisal expert to support its taking claim, but its economic expert, Dr. Nicholas, testified that "fair market value" subject to the regulation was a myth: the only buyers who would pay any substantial sum for the property were foreigners, unaware of the physical nature of the property and of the legal restrictions on its use, victims of fraud or self-deception. Defendant's expert, Mr. Cantwell, a qualified real estate dealer, testified that there was a fair market value subject to the regulation, as above set forth, the "willing buyers" of the conventional value formula being investors willing to forego immediate income in hope of long-term gain.

The locale makes the government theory more plausible than it might otherwise be. South Florida has long enjoyed renown as not only a place where the gullible are fleeced, but also one where far-seeing investors realize fortunes. With the proximity of the huge and growing metropolis of Miami, expanding too in that specific direction, there can be no telling what future Miamians will want to use the instant tract for, still less what they will be willing and able to pay. Mineral land in the mountains or deserts may well be foreseen to have no possible future use except for production of minerals. This land is different and the trial judge recognized as much when he got to the "damage" phase for he found that the property would have substantial residual value, in view of its location, with all the minerals removed; thus a "willing buyer" would pay more than the mere value of the land as mineral land.

Of course, we take it for granted, as Mr. Cantwell did, that the "willing buyer" of the market value formula has got to be one who is correctly informed about the physical character of the land, as well as legal restrictions on its use. He tried to disregard what those who came to be fleeced might pay.

## IV

■ Thus, we have set up for adjudication a contest for employment as a test between immediate use value or nonvalue and fair market value. In *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), it is held that without evidence of a diminution in fair market value, a prohibition of mining on a tract cannot be held a taking. In *Florida Rock Industries, Inc. v. Bystrom, supra,* the Florida court holds that the lack of any immediate use of or for land does not exclude determination of its fair market value by analysis based on comparable sales of similarly restricted land. Slip op. at 8. Our trial court, as we read it, selected the immediate use value because it thought it prescribed by the language of the Supreme Court, read as saying that a denial of an *immediately* viable use is a taking, regardless of any fair market value analysis. No such analysis appears to have been before the Supreme Court when it gave such weight to such denial in the cases cited. We doubt very much whether the Court ever meant to say, or would have said, that a denial of any *immediately* viable use must be a taking even though it had no effect on the fair market value of the property. The further reason for the Claims Court's election was that it believed Dr. Nicholas that the only "willing buyers" were victims of deception, and disbelieved Mr. Cantwell that there were serious and well-informed "willing buyers."

We do not perceive any legal reason why a well-informed "willing buyer" might not bet that the prohibition of rock mining, to protect the overlying wetlands, would some day be lifted. The statute would not have to change, only the perceptions of the Army engineers. One who remembers when wetlands were called swamps, when their draining or filling was deemed progress, and when their main environmental impact was in the production of noxious disease-bearing mosquitos, and who has observed their present status, will not be astonished if some day a mosquito bred in a swamp bites someone and infects him with malaria, and the old beliefs revive. Not only do we take as given, but we are

impressed by, the wealth of scientific information that went into the district engineer's decision. He had light not available to our forebears. By the same token, our descendants may know things we do not even suspect. There is nothing so certain in life as that all certainties become uncertain, and some are replaced by their opposites. One who invests in land on this faith may be a speculator, but he is not on that account a gull.

Normally an appellate court accepts a trial court's election of whom to believe among conflicting testimony. Due to the different occupations of Dr. Nicholas and Mr. Cantwell, however, and their consequently different opportunities to perceive how the market operates, and who the "willing buyers" are, we think that the court's acceptance of Dr. Nicholas' testimony is clear error. We are left with a profound conviction that a mistake has been made. Since the tract was not listed for sale, the $4,000 per acre offer, the frequent inquiries, and the assessed value, must have reflected interest of knowledgeable people, not foreigners or gulls. There may be a question what knowledgeable buyers would have paid, but that they would have paid some substantial figure seems certain.

The trial court also invoked the rule that damages must not be speculative, by analogy as he was not ascertaining damages at that point. This rule, however, means that the court must not, itself, speculate, i.e., guess, about potential end uses or markets when the speculation is so remote or improbable that one would not invest his money in it. It does not exclude consideration of a relevant market made up of investors who are real but are speculating in whole or major part. *Florida Rock Industries, Inc. v. Bystrom, supra,* 485 So.2d at 447. Anyone who buys mineral property is speculating to a large extent, and so is even to some extent one who buys "blue chip" securities. *See* Orgel *Valuation Under Eminent Domain* § 31 (2d ed. 1953).

■ Whether based on a belief that a use value analysis was required, or on a belief that the only serious bidders for the property subject to the restriction were fraud victims, or on a belief the other serious informed bidders were speculators, the exclusion from consideration of defendant's testimony as to the potential market was clear error or error, and highly prejudicial to appellant. We are of the opinion that Mr. Cantwell's testimony, if considered and believed, established the existence of a market in which Florida Rock could have disposed of the property and mitigated the severity of the regulatory action here involved, and the court should have considered such a possibility. Indeed, if there is found to exist a solid and adequate fair market value (for the 98 acres) which Florida Rock could have obtained from others for that property, that would be a sufficient remaining use of the property to forestall a determination that a taking had occurred or that any just compensation had to be paid by the government.

■ The court's methodology is objectionable for the further reason that, by dispensing with the fair market value test in determining the occurrence of a taking, it makes the case improperly one to recover for frustration of business expectations. A taking is founded on the fact that Florida Rock is prevented from doing a profitable business in the extraction and sale of its limestone. Yet frustration in performance of even an existing contract is not a taking of contract rights, *Omnia Commercial Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923) still less a hope of future profitable contracts. This case is cited and followed in *Connolly v. Pension Benefit Guaranty Corp., supra,* our latest Supreme Court pronouncement. *Cf. Kimball Laundry Co. v. United States,* 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949) in which, in the case of a temporary taking some injury to business is allowed to be awarded, with a careful explanation that this would not be so of a permanent taking. If, therefore, the award here was for a temporary interruption of production, the rule might be different.

## V

According to *Agins v. City of Tiburon*, 447 U.S. at 261, 100 S.Ct. at 2141, the question of identifying a regulatory taking involves a "weighing of private and public interests." What is called the "seminal decision" in *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) is cited as illustrative. There the challenged zoning laws were held to bear "a substantial relationship to the public welfare, and their enactment inflicted no irreparable injury upon the landowner." 447 U.S. at 261, 100 S.Ct. at 2141.

Conducting a similar weighing here, the preservation of wetlands bears a substantial relationship to the public welfare as perceived by the best lights of our time. The pollution of the water, though the necessary hook for jurisdiction of the Army engineers, is not claimed in the district engineer's decision to be by itself very serious. The decrease in water quality due to turbidity will be "short term." "Water pollution does not appear to be a problem" at (water supply) wells adjacent to similar pits. No difference in water quality appears. Thus, when appellant characterizes the regulatory action as one to prevent pollution, it is really elevating form over substance. The concern of the district engineer is almost exclusively the continued existence of the wetland, not the temporary and moderate pollution incident to the occurrence of actual mining. It would be forensic semantics to characterize his decision as one against pollution, and the action has to be analyzed more carefully to weigh the private and public interests.

The Clean Water Act covers many types of pollution. We may assume, arguendo, that one who wanted to put toxic wastes in drinking water would encounter a balancing of public and private interests most unfavorable to his position and not likely to result in a compensation award. Denial of the permit frustrates him in doing harm. On the other hand, a moderate and *pro forma* polluter such as Florida Rock does no harm. Denial of the permit requires it to maintain at its own expense a facility, the wetlands, which by presently received wisdom operates for the public good, and benefits a large population who make no contribution to the expense of maintaining such facility. This appears to be a situation where the balancing of public and private interests reveals a private interest much more deserving of compensation for any loss actually incurred. The private interest, unless relieved by a Tucker Act award, sustains what may well be a permanent obligation to maintain property for public benefit, to carry the taxes and other expenses, and not to receive business income from the property in return.

## VI

■ Defendant says there was no taking because the 98 acres held taken are only a small part of a single tract of 1,560 acres, the rest not taken, and no restriction arising from the denial of the permit applies to them. Such a contention had dignity and was of decisive importance in the cases of *Deltona, supra,* and *Jentgen, supra,* but there the Army engineers considered the entire tracts and determined that portions thereof could be developed as proposed. Here the Army engineers considered only the 98 acres. As to the rest, it is and, for the immediate future, remains illegal to mine without a permit in the only fashion Florida Rock considers feasible. Florida Rock could apply seriatim for permits to allow mining on the rest, and inevitably, from the evidence and the findings, have them denied. We do not think that the mere possibility a permit might be granted, like the possibility one might put a pot of water on a hot stove and have it freeze, is a reality requiring us to deem that viewing the 1,560 acres as a whole, Florida Rock might in theory mine a lot of limestone, or perhaps market a housing development as appellant also would have us speculate.

■ The near certainty that the pot of water will boil is what justifies Florida Rock's cross-appeal in which it says, if it can't, as a practical or legal matter, mine on the rest of the property, the rest is

taken, and the judgment should be modified to provide an award in the sum stated in the trial court's alternative finding. There are, however, answers to this. In the first place, if the Army engineers adverted to the possibility of making the government an involuntary purchaser at all, they must have supposed the exposure would be much reduced by confining their determination to a test case of 98 acres. Such an interest in controlling the extent of exposure is entitled to some judicial respect. In the second place, since the 98 acres sufficed for Florida Rock's needs for three years, there is no likelihood that Florida Rock would, if allowed, mine over 98 acres in three years. Therefore, the frustration of any viable economic use, constituting the alleged taking, does not as to the excess commence until over three years have passed. If the taking legally occurs at the start of the three years, interest starts to run, which seems unfair when Florida Rock never expected to derive income from it. Thirdly, the real injury becomes more speculative as the time of intended development becomes more distant. Fourth, Florida Rock might have precipitated takings by filing a series of applications for 98-acre segments of the whole, but if the Army engineers refused to consider them, the refusal would be reviewable under the APA and not under the Tucker Act. We think it is very questionable whether a refusal to consider applications relating to remote periods would be deemed an abuse of discretion and, on the other hand, to hold the mere enactment of the statute a taking would be contrary to *Hodel*, *Agins*, and indeed, just about all the recent Supreme court authorities.

If the instant case, after the remand, still results in a substantial award against the government, the Army engineers probably would want to consider whether the continued protection of the 1,560 acres of wetlands was worth the damage to the public fisc. This right should be preserved to them.

## VII

Appellant also attacks the decision below on the curious ground that the comparable sales, used as the trial court's base to compute the fair market value of the land it held taken, were sales of rockland near the Florida Rock site, but free of government restrictions on mining. The law, says appellant, requires land taken to be valued subject to all existing legal restrictions on its use. Thus, if the regulation constituting the taking reduced the value of land subject to it to zero, the very severity of the economic injury would relieve the taker of all but nominal fifth amendment liability. We suppose appellant added this contention to provide a little humor for an otherwise serious and scholarly brief, and say no more about it.

### Conclusion

We hold that the trial court committed an error of law in investigating and determining, notwithstanding the district engineer's finding that there was at least some *de jure* pollution to be anticipated from Florida Rock's project, in reality there was none. The apparent purpose was to sustain the assessment of taking liability for injury inflicted by a regulation, but the alleged taker had a right, in the Claims Court, to have the claim assessed on the basis that its regulatory action was valid and correct in all respects. The trial court also erred in assessing the severity of economic impact exclusively on the basis of a use value formula, refusing to consider any fair market value remaining in the land and realizable by the landowner. We think, however, the record reveals a substantial possibility that a taking should be held to have occurred under correct legal standards, so a remand is necessary. On remand, the court should consider, along with other relevant matters, the relationship of the owner's basis or investment, and the fair market value before the alleged taking, to the fair market value after the alleged taking. In determining the severity of economic impact, the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored.

We affirm, however, the trial court's refusal to determine that land was taken in excess of the 98 acres as to which the permit was sought.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.