ALLIED–GENERAL NUCLEAR
SERVICES, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 146–83C.

United States Claims Court.

May 22, 1987.

Bennett Boskey, Washington, D.C., for plaintiff; Edwin E. Huddleson, III, and Volpe, Boskey and Lyons, H. Roderic Heard, Edward T. Butt, Jr., John E. Frey, Susan L. Walker, Steven E. Danekas, David S. Rees, and Wildman, Harrold, Allen & Dixon, Chicago, Ill., Brian D. Forrow, Gerard P. Rooney, and Allied Chemical Nuclear Products Inc., Morristown, N.J., James B. Hogan, Thomas J. Smith, David L. Ream, and Valley Pines Associates, San Diego, Cal., of counsel.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant; David M. Cohen, Director, Dept. of Justice, Sol. E. Leo Slaggie, Richard S. Mallory and Irwin B. Rothschild, Nuclear Regulatory Com'n, and Gregory Fess, Dept. of Energy, of counsel.

## OPINION

YANNELLO, Judge.

This case was brought pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), seeking compensation of $500 million for a taking by the United States. The matter is before the court on plaintiff's and defendant's motions for summary judgment.[*]

### I. *Factual Background*

This court recognizes that each case in which a taking is alleged is unique. In most cases the uniqueness lies in the facts, and the development of those facts is important to the resolution of such case. Usually this factual development requires trial and the resolution of the case depends on factual findings. The situation in the instant case, however, is somewhat different.

Firstly, most of the basic facts in this case are stipulated and undisputed. (Even the facts about which there is any significant controversy have been stipulated for the purposes of the pending dispositive motions.)

Secondly, there are questions of law present in this case, and raised by the pending motions, which may well be dispositive of the entire matter. In any event, as the parties have recognized, even if the case were not resolved on the basis of these motions, a trial would be appropriate only after resolution of these legal issues since the scope of trial may be affected thereby. Accordingly, this court now undertakes a review of the pending dispositive motions.

The complex facts material to the pending motions have been most ably stated in the parties' briefs and are essentially agreed to. (In addition, these facts are recited in Westinghouse Electric Corp. v. United States, 598 F.2d 759 (3d Cir.1979), in which plaintiff in the instant case joined as a party plaintiff.)

No purpose would be served by reiterating these facts in detail here; a detailed Statement of Facts is set forth in the Appendix hereto.

The facts central to resolution of this case can be summarized briefly as follows, addressing first the general factual background and second, the facts concerning the "bargaining chip" issue raised extensively by the parties.

Prior to 1954, private corporations were unable to possess, produce, or use nuclear materials. In the years after 1954, the private commercial use of nuclear materials was encouraged, particularly in the generation of electrical power. As part of the

---

[*] The suit was instituted by several corporate entities, who acted in concert in connection with the activities giving rise to this claim. Hence, reference herein is to a singular plaintiff.

cycle of nuclear-generated power, a waste product emerged known as "spent fuel." This spent fuel could be recycled or reprocessed so as to separate radioactive waste as well as plutonium. (Plutonium, unlike the enriched uranium used in the generation of electrical power, also has an application in nuclear weaponry.)

Changes in statutory provisions, such as the Atomic Energy Act (AEA) of 1954, 42 U.S.C. §§ 2011–2282, and the Private Ownership of Special Nuclear Materials Act (POSNMA) of 1964, 42 U.S.C. §§ 2012 *et seq.*, reflected these changes and contained the provisions pursuant to which private commercial enterprises could use nuclear fuel. The AEA, for example, provided for the granting of licenses to construct plants for the reprocessing of fuel and, after construction, to operate such plants. The AEA also provided that the issuance of such licenses should take into account whether the issuance "would be inimical to the common defense and security or the health and safety of the public". 42 U.S.C. § 2236.

For the purposes of the pending motions, and based on the facts set forth in detail in the Appendix, it is concluded that, prior to 1977, the government encouraged and exhorted private commercial enterprises to enter the field of nuclear generation of power and of reprocessing of spent nuclear fuel.

Plaintiff obtained a license to construct a reprocessing facility at Barnwell, South Carolina, and began construction in 1971. During the next several years, a number of events occurred, all of which led to the situation giving rise to this suit. In 1974, the government began preparation of a generic environmental statement referred to as GESMO. At about the same time, the government began proceedings on plaintiff's application for an operating license for its Barnwell plant.

Also at about this time, India conducted its first atomic test, using plutonium recovered from a spent-fuel reprocessing plant. In 1976 and 1977, the French and West German nuclear industries were negotiating to sell reprocessing technology to Brazil and Pakistan.

The international concerns about proliferation of nuclear technology, materials, testing, and weaponry had been the subject of non-proliferation treaties in 1968 and 1978. (*See* Appendix, footnote 12.) In 1976, President Ford discussed the risks of plutonium recycling and declared that the country "should pursue reprocessing and recycling in the future only if they are found to be consistent with our international objectives". (*See* Appendix, footnote 7.)

In April 1977, President Carter noted with alarm the serious proliferation risks of plutonium recycling and announced the sponsorship of an International Nuclear Fuel Cycle Evaluation (INFCE) program. The government's immediate response was to defer indefinitely the commercial reprocessing and recycling of plutonium from spent fuel used in the generation of power.

The agency immediately announced a postponement of the GESMO hearings and a reassessment of the applications for licenses relating to recycling. The agency requested comments and received comments on behalf of the President, re-emphasizing his earlier statements. In December 1977, the agency announced the termination of all GESMO proceedings as well as most proceedings relating to license applications for plutonium recycling. The agency would reexamine the matter after the conclusion of investigations into alternative fuel cycles, which was expected in about two years. (This directive was memorialized in 1978.)

Parties interested in such license proceedings, including plaintiff, filed suit to protest the cessation of proceedings. The agency action was upheld, however, and the court, in *Westinghouse*, 598 F.2d 759, stated that the agency-imposed "moratorium" was appropriate when sound regulatory reasons existed for doing so, as where the moratorium was designed to enable the agency to make rules and regulations which would be applied in the context of processing licensing applications. The court found that the agency did not abuse its discretion or act arbitrarily or capri-

ciously "when it rested its decision in part on a desire not to obstruct the goal of securing international non-proliferation." *Westinghouse,* 598 F.2d at 776.

The court provided that the agency may not completely terminate the license application proceedings, simply by declaring an open-ended moratorium, without passing on the merits of the applications and that the agency must grant licenses unless it makes a finding of inimicality to the common defense and security or to the public health and safety. *Westinghouse,* 598 F.2d at 774.

The court concluded that:

When and if it ever becomes apparent that the [agency] has de facto denied the license applications despite the applicants' compliance with the pertinent regulations and without making a finding of inimicality, or that the moratorium is of unreasonable duration, judicial recourse will be available to the aggrieved parties.

*Id.*

The final INFCE hearings were concluded and a report was issued in March 1980. Also at that time a study was issued concerning an interagency Non-proliferation Alternative System Assessment Program (NASAP). Statements on behalf of the President continued, at that time, to recommend that the GESMO proceedings should remain terminated and that a reopening would be inimical to national security and the non-proliferation foreign policy interests of the United States. Then in 1981, President Reagan stated:

I am lifting the indefinite ban which previous administrations placed on commercial reprocessing activities in the United States. In addition, we will pursue consistent, long-term policies concerning re-

processing of spent fuel from nuclear power reactors and eliminate regulatory impediments to commercial interest in this technology, while ensuring adequate safeguards.

(*See* Appendix, pp. viii and ix.)

Notwithstanding this statement, the agency has not reopened GESMO proceedings or licensing proceedings.

For purposes of the pending motions, and based on the facts set forth in detail in the Appendix, it is concluded that the government's refusal to consider plaintiff's application to operate its Barnwell facility, and the agency's continuation of its indefinite moratorium on such consideration, is based on concerns of international proliferation. It is also concluded that the agency has foresaken domestic commercial reprocessing of spent nuclear fuel as a "bargaining chip" in an effort to further international agreement on non-proliferation.

## II. *Issues Presented*

 The parties' briefs address the essential elements of a taking claim, namely, whether there is a property interest here which can be the subject of a taking and whether there has in fact been a taking of that property interest by virtue of the government's actions.[1]

Plaintiff contends that the government's refusal to consider its application for an operating permit constitutes a taking of its license, its plant, or both, requiring just compensation. Plaintiff also contends that even if its property has not been taken for a "public use" by the government, the government regulation and restrictions on the use of the plant constitutes a taking "for a public purpose", and requires just compensation.

---

1. One of the other critical elements in determining if a taking has occurred is whether, in fact, the property owner has been deprived of economically viable uses of the property. Evaluation of this factor is based not on a mere diminution of value nor on a denial of the highest and best use of the property, but on the value of the remaining uses to which the property may be put. *See, e.g., Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982).

In the instant case we need not now address that issue. That matter is not properly the subject of the pending motions, and the parties have not stipulated to any values of the property, either before the alleged taking or after. Rather, here, the threshold question is whether there has been, as a matter of law, a taking claim stated based on the facts as set forth in the text above.

With respect to an operating license, defendant contends that the issuance of a license which is subject to certain conditions and administrative considerations, is not a "property right" which can be the subject of a taking, requiring compensation. Moreover, with respect to plaintiff's plant, defendant argues that it has not been taken but remains plaintiff's property, free to be used in any legal manner (absent use as a licensed nuclear reprocessing plant).

Much of the briefing by both parties centered around these issues of regulatory taking.[2]

### III. *Opinion*

■ In 1977, hearings on and consideration of plaintiff's application for an operating license ceased without reaching a decision. Much of what plaintiff complains of in this case centers around that cessation and the actions of the agency and of the Administration generally, including the President and other officials, which led to it. The plaintiff argues that that cessation—and its continuation even to this time—is contrary to the governing statute, the AEA, and constitutes a taking of its property.

However, the 1977 cessation—at least a cessation for some period of time—has been upheld by the court which is statutorily charged with the jurisdiction and responsibility for rendering such determinations, in an action in which both parties here participated. *See Westinghouse, supra,* wherein the court upheld a moratorium designed to enable the agency to promulgate reasonable rules and regulations.

Moreover, the court further stated that, if it became apparent that the agency de facto denied an application without making the required findings of inimicality to pub-

lic safety or defense or that the moratorium continued for an unreasonable duration, judicial recourse would be available.

A similar situation was presented in *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 485, 657 F.2d 1184 (1981), where the denial of a permit was upheld as valid in a suit under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1976) in United States District Court before a claim for taking was presented to the United States Court of Claims under the Tucker Act, 28 U.S.C. § 1491.

In *Deltona,* plaintiff did not take issue with this finding in the Court of Claims. In the instant case, plaintiff apparently seeks to contest the finding of the validity of the 1977 cessation of hearings in this court by alleging that the cessation, and the reasons therefor, were improper. Moreover, plaintiff argues that the continued cessation over several years—which the *Westinghouse* decision did not address for the obvious reason that such continuation had not then occurred—is improper.

However, as noted in the text above, and in the accompanying Appendix, Congress, in the governing statute, the AEA, vested in administrative tribunals and in other federal courts, but not in this court, the jurisdiction to review, in the first instance, the validity and propriety of the agency regulatory action. Where such jurisdiction is expressly placed elsewhere, this court cannot, under the guise of hearing a fifth amendment taking claim, assume such jurisdiction to determine the validity of agency regulatory action, or to reverse the findings of validity made by those tribunals statutorily charged with that responsibility. *See also, e.g., Shanbaum v. United States,* 1 Cl.Ct. 177 (1982) *aff'd* 723 F.2d 69 (Fed.Cir.1983).[3]

---

2. In considering the parties' briefs, prior to oral argument, the court noted that the contentions of the parties might be restated so as to embrace other causes of action, some perhaps raising jurisdictional issues. At the outset of oral argument, the court voiced these concerns, which the parties were given an opportunity to address then and in post-argument supplemental briefing.

3. Because Congress, in the AEA, expressly places jurisdiction to review the regulatory action elsewhere than this court, we need not consider other general areas in which a Tucker Act suit would be appropriate. *Cf. South Puerto Rico Sugar Co. Trading Corp. v. United States,* 167 Ct.Cl. 236, 334 F.2d 622 (1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1964).

■ This circumstance, in the instant case, is not unlike that in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 185 (1984), where the regulatory taking was alleged to have arisen in connection with the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136a and 136h. There, the Court recognized that a taking might occur if the agency were to engage in action which would be unlawful within the statutory framework (such as if it were to release data submitted between 1972 and 1978 when confidentiality had been statutorily assured). The Court further found that if such a taking did occur, the proper recourse was a suit under the Tucker Act, which could not be repealed by implication in FIFRA. However, the Court also noted that FIFRA put in place an arbitration remedy designed to determine the amount of just compensation, which must be exhausted as a pre-condition to bringing a Tucker Act claim.[4] Until that avenue had been exhausted, no Tucker Act claim could be advanced.

A somewhat similar result was reached in *United States v. Florida Rock Industries*, 791 F.2d 893 (Fed.Cir.1986), wherein the decision of the lower court was affirmed in part and vacated in part. At issue was a taking claim resulting from regulatory action in which a permit to mine limestone was denied. The denial was based on the agency's finding that there was at least some *de jure* pollution by plaintiff's project. The lower court reviewed this determination and found that no pollution would result, and the Court of Appeals determined that to be error, concluding that:

> ... [T]he alleged taker had a right, in the Claims Court, to have the claim assessed

on the basis that its regulatory action was valid and correct in all respects. *Florida Rock* 791 F.2d at 905.

The court further stated:

> ... [W]e think it is indisputable that the proper way to challenge the decision to grant or withhold the permit would be under the Administrative Procedures Act (APA), 5 U.S.C. § 702 and ff.

*Florida Rock*, 791 F.2d at 898.

Similarly, the court noted that an agency refusal to consider applications for permits would be reviewable under the APA and not under the Tucker Act. *Id.* at 899.

Thus, in the instant case, if it is believed that the agency's refusal to recommence consideration of the plaintiff's application for an operating license is invalid or improper, or that such refusal amounts to an invalid de facto denial of the license, the proper place to assert such challenge is through the channels prescribed in the AEA, and not in this court. Pursuit of such redress may presumably lead to two alternative results: the agency's continued moratorium may be upheld or it may be found to have been invalid and an invalid de facto denial of the application; if the agency is required to resume consideration of plaintiff's application, the application may or may not be denied.[5]

■ This court, lacking the jurisdiction to determine, in the first instance, the validity of the agency regulatory action under the AEA and noting the absence of any finding of invalidity by the appropriate tribunals, assumes, as did the Federal Circuit Court of Appeals in *Florida Rock*, that the election of a Tucker Act suit concedes the authority of the agency to take the regulatory action (including the prolonged mora-

---

4. The Court also noted that, while such statutory remedies must be exhausted, the action in this court under the Tucker Act would proceed essentially *de novo* in determining the amount of just compensation due plaintiff, without the requirement that either party dispute the correctness of the amount determined by the arbitration.

5. If a de facto denial, or a denial after resumed consideration of the application, were to be reversed by the agency, or upon administrative

or judicial review of the agency regulatory action, the plaintiff may have been temporarily deprived of the use of its property but, as the Court noted in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, n. 6, 88 L.Ed.2d 419 (1985), it has not yet resolved the question whether compensation is a constitutionally mandated remedy for "temporary regulatory takings". In any event, we do not have such a situation present in this case at this time.

torium of hearings) now in issue. This assumption is made notwithstanding the vehemence of plaintiff's contentions that they agency action is wholly improper, invalid, and unwarranted, since such contentions are believed to be better addressed to some other tribunal under the AEA. Indeed, in a supplemental brief filed May 29, 1986, plaintiff acknowledges that the validity of the agency's 1977 action has been upheld in *Westinghouse*, and further acknowledges that it will accept that decision without "further APA-review proceedings" so as to proceed directly in this court on a Tucker Act taking claim.

■ The next issue then presented to this court is whether the presumably correct agency regulatory action constitutes a taking. Under the circumstances here present, this court concludes that it does not.[6]

This court does not in any way refute the now well-established doctrine that government regulation, even if for a valid public interest but without actual public use of the owner's property, can constitute a taking. The Court of Claims restated this doctrine in *Deltona*, where it also found that no taking occurred because plaintiff had not been deprived of economically viable uses of its lands (a matter not in issue at this time in the instant case). Rather, this court's conclusion is based on an analysis of the differing circumstances present in the instant case from those in which such a taking has been found.

In an early decision in *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002 (1967), the denial of a license by the Maritime Commission was found not to constitute a taking compensable under the Constitution. The court stated as follows:

> The Commission's role was simply part of a pre-existing regulatory process known to the plaintiff from the time it purchased the *Eastport* and the Commission's failure to give its approval within the necessary time took no property from plaintiff any more than a comparable failure by the Federal Trade Commission, the Securities and Exchange Commission, or the Federal Power Commission, in their administrative process, would amount to a taking.

*Id.* at 612, 372 F.2d at 1011.

The Court of Claims noted particularly that the regulatory process was "pre-existing" and was "known to plaintiff".

On the other hand, the Federal Circuit Court of Appeals in *Florida Rock, supra,* opined that the record revealed a strong possibility that a taking occurred, if the proper legal standards were employed in making such determination, while also noting that the regulatory action in issue resulted from amendments of the process which "followed the acquisition [of the statutory property] and, according to the trial judge, *Florida Rock* need not have foreseen them." *Florida Rock,* 791 F.2d at 895.[7]

---

6. This court also notes that the agency moratorium on hearings in 1977 has been upheld, that plaintiff has not requested, pursuant to the AEA, a resumption of hearings, or the license itself. Thus the claim now presented may well be premature. *See, Riverside Bayview,* 106 S.Ct. at 460.

Plaintiff, of course, contends that the 1977 cessation of the GESMO and related hearings has itself totally and permanently deprived it of its property rights. In any event, we need not encourage needless future litigation of any ripened claim since the court concludes that in no event would plaintiff's property be subject to a taking by proper regulatory action.

Moreover, as noted in footnote 1 above, the parties disagree as to the remaining uses to which the property might be put (as well as any economic valuations). Plaintiff also contends

that its application has been effectively denied since there is no longer any possibility of using the facility for its intended purpose. Notwithstanding these controversies, the court believes that, as a matter of law, the regulatory action here cannot constitute a taking requiring just compensation.

7. In yet another case, a combination of the factors present in both *Eastport* and *Florida Rock* was present.

In *Deltona,* where no taking was found because economically viable uses still remained, the court noted that the property interests were generated pursuant to a limited existing regulatory framework, which framework was then considerably expanded; the court also stated, however, that:

"... when Deltona acquired the property in 1964, it knew that the development it contem-

This focus on foreseeability was upheld at length by the Supreme Court in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984), where the Court noted the difficulty in determining when a regulatory taking has occurred:

As has been admitted on numerous occasions, "this Court has generally 'been unable to develop any "set formula" to determine when "justice and fairness" require that "economic injuries caused by public action'" must be deemed a compensable taking [compensated by the government, rather than remaining disproportionately concentrated on a few persons.] The inquiry into whether a taking has occurred is essentially an "ad hoc, factual" inquiry. The Court has, however, identified several factors that should be taken into account when determining whether a governmental action has gone beyond "regulation" and effects a "taking". Among these factors are: "the character of the governmental action, its economic impact, and its interference with reasonable investment backed expectations." [Citations omitted.]

The Court focussed on the criterion of the reasonableness of the investment-backed expectation. *See, also, Whitney Benefits, Inc. v. United States,* 752 F.2d 1554, 1558 (Fed.Cir.1985); *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).

In *Monsanto,* the owner had generated health, safety, and environmental data concerning its pesticide products which it was required to submit to the government in order to obtain a registration to market the products. (*See* FIFRA, *supra.*) The Court held that such data were property rights, the taking of which might require just compensation.

The *Monsanto* opinion addressed the statutory scheme (1) from its inception in 1947, (2) through treatments accorded through 1972, (3) from 1972 to 1978, and (4) the amendments after 1978. The statutory scheme in effect from 1972 to 1978 gave the submitter of the data an opportunity to designate "trade secrets" with the explicit assurance that the agency was prohibited from disclosing publicly (or considering in connection with the application of another applicant), any data which constituted "trade secrets". The Court found that this assurance formed the basis of a reasonable investment-backed expectation in the data. Such reasonable expectations would be frustrated by any agency disclosure not authorized by the statute then in effect (from 1972 to 1978 with respect to data submitted during that period), and a compensable taking might result.

With respect to the amendments effective in 1978, the Court held that:

... Monsanto could not have had a reasonable, investment-backed expectation that [the agency] would keep the data confidential beyond the limits prescribed in the amended statute itself. Monsanto was on notice of the manner in which [the agency] was authorized to use and disclose any data turned over to it by an applicant for registration.

* * * * * *

plated could take place only if it obtained the necessary permits from [the agency]. Although at that time Deltona had every reason to believe that those permits would be forthcoming when it subsequently sought them, it also must have been aware that the standards and conditions governing the issuance of permits could change. Deltona had no assurance that the permits would issue, but only an expectation." *Id.* at 491.

This discussion was, of course, directed to plaintiff's assertion that the mere deprivation of its expected highest and best use of its land, holding that such contention does not satisfy the requirements for a taking.

In the instant case, the regulatory framework of the AEA was in place when plaintiff acquired or generated the property interest which it alleges has now been taken. Moreover, like *Eastport,* and unlike *Deltona,* the standards and conditions requisite to obtaining a permit did not change; they remained throughout the public health and safety and common defense and security. Plaintiff's contention that administrative concentration on international proliferation and bargaining chips changed the standards anticipated under the existing regulatory framework, is belied by the *Westinghouse* decision upholding these considerations in imposing the 1977 moratorium and, indeed, by the presumption, in this taking case, that the regulatory action was proper. *See* also the discussion in the text above concerning proper tribunals to contest such regulatory regularity.

If, despite the data-consideration and data-disclosure provisions of the statute, Monsanto chose to submit the requisite data in order to receive a registration, it can hardly argue that its reasonable investment-backed expectations are disturbed when [the agency] acts to use or disclose the data in a manner that was authorized by law at the time of the submission.

*Monsanto,* 467 U.S. at 1006–07, 104 S.Ct. at 2874–75.

The Court, in *Monsanto, supra,* concluded:

Thus, as long as Monsanto is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate government interest, a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking.

*Id.* at 1007, 104 S.Ct. at 2875.[8] Thus, the foreseeability of the existing statutory limitations played a key role in the Court's decision.

In sum, in *Eastport,* the Court of Claims found that property interests which were generated pursuant to an existing and foreseeable regulatory framework were not, and could not be, taken by virtue of the operation of that framework. In *Monsanto,* the Supreme Court found that property interests which were generated pursuant to an existing and foreseeable regulatory framework permitting disclosure were not, or could not, be taken by virtue of the operation of that framework or disclosure. Conversely, the Court in *Monsanto* also found that property interests which were generated pursuant to an existing regulatory framework which did not envision disclosure, could be taken by operation of the unforeseeable regulatory action of disclosure.

Plaintiff would apparently concede in this taking case, that the exercise of regulatory action was valid under the AFA. But, at the same time, it argues that the action involved the imposition of standards, such as changes in the state of the art and proliferation of technology, which were not foreseeable under the AEA. These contentions would appear to be inconsistent.

If the agency's action utilizes standards not contemplated within the AEA, then the action should be challenged, elsewhere, as invalid. If the agency's action is valid, and employs standards consonant with the AEA's proscription of public health and welfare and common defense and security, then the standards were foreseeable.

In addition to considering the issues of foreseeability, the identification of regulatory action as a taking involves a "weighing of private and public interests". *Agins v. City of Tiburon,* 447 U.S. 255, 261, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). With that, as the Court stated in *Monsanto, supra,* one must consider whether the regulatory action is such that the private property owner should bear the burden or whether the public interest and benefit warrant a sharing of that burden by the public fisc. In *Florida Rock, supra,* wherein the court found that, under properly applied legal principles a taking may well have occurred, the court stated:

This appears to be a situation where the balancing of public and private interests reveals a private interest much more deserving of compensation for any loss actually incurred. The private interest, unless relieved by a Tucker Act award, sustains what may well be a permanent obligation to maintain property for public benefit, to carry the taxes and other expenses, and not to receive business income from the property in return.

*Florida Rock,* 791 F.2d at 904. (In that case, of course, the matter of determining the exact valuations of the property are to

**8.** Monsanto also argued that the statute's very requirement of data submission as a precondition to marketability was a violation of its constitutional rights. The Court, in summarily dismissing this contention, noted that:

"[S]uch restrictions are the burdens we all must bear in exchange for 'the advantage of living and doing business in a civilized community.' [Citations omitted.] This is particularly true in an area, such as pesticide sale and use, that has long been the source of public concern and the subject of government regulation." *Id.* at 1007, 104 S.Ct. at 2875.

be the subject of remand to the lower court.) But here, again, it must be noted that the lower court found that the changes in the regulatory scheme need not be foreseen by the property owner (and the appellate court apparently accepted such finding).

In the instant case, we have a situation where a plaintiff developed property, at considerable expense, so as to partake of a nuclear fuel industry with the expectation (backed by investments) that it will lead to a most profitable undertaking over many years to come. So also acted the diet-food industry in using, first, cyclamates, then saccharin, and currently aspartame. Both industries generated this property pursuant to existing statutes which provided that continued licensing would be subject to the public interest including, *inter alia,* public safety considerations. As the industries might flourish, considerable returns on the investment might be expected. Any change in the state of the art or technology, however, such as findings of carcinogenicity of some of the artificial sweeteners, might bring with it recalls of products and financial losses.

On balance, the circumstances present here are such that the plaintiff, albeit at apparently considerable expense, entered into an enterprise which, by virtue of new developments, reaped not the expected financial success but rather considerable loss. Just as the private venture would reap the rewards of success, so must it bear the burden of loss. The regulatory action here, presumed to be valid, cannot be said to have involved considerations so unforeseeable that the public, rather than the plaintiff, should bear the burden of the loss.[9]

Based on the standards so far enunciated by the higher courts, and based on the apparent circumstances present in the instant case as compared with those giving rise to such higher court decisions, it is concluded that the property interest generated here cannot be said to be subject to a possible taking.

Nothing in the *Riverside Bayview* decision contradicts the decision reached in this case. Indeed, it appears that the issue was neither raised nor considered in *Riverside*.[10] There has been no case cited to this court in which a property interest, which was acquired and developed subsequent to and subject to a promulgated and existing regulatory scheme, has been found to have been "taken" by the operation and lawful implementation of that regulatory scheme so as to require compensation under the Constitution.

Another significant issue arises in this case. It has been noted that the plaintiff's application for the requisite license has not yet been denied by the agency.

Since the issuance of the INFCE report in 1980, no further proceedings have been commenced by the agency nor have they been requested by plaintiff. Likewise, plaintiff has not sought to use the appeals process contained in the AEA to compel consideration of its application as suggested by the court of appeals in the earlier *Westinghouse* decision.

■ Thus, the *Riverside* opinion would reinforce this court's decision that a taking claim can lie here, if at all, only after the administrative regulatory process has been enforced, has been concluded, and results in a denial (and a denial subsequently

9. Again, as noted in footnote 5, a different situation of *operating licenses were to be found* unwarranted, either administratively or through appropriate recourse to the judiciary, and a license subsequently issued. The question of a temporary taking is as yet unresolved. (Any such issue might also occasion the raising of a defense of laches, involving unreasonable delay and possible prejudice to defendant, by virtue of the time elapsed in obtaining the reversal.) As yet, no such reversal has been obtained, nor has plaintiff fully pursued possible AEA review so as to seek such reversal.

10. Unlike the instant case where constant regulatory jurisdiction and statutory factors have been maintained, it appears that the *Riverside* case involved an expansive change in the agency's regulations interpreting its jurisdiction, rendering it more similar to the *Deltona* case than to *Eastport,* both of which are discussed in the opinion above. In any event, the issue of foreseeability, and the concomitant question of whether the property interest was generated within the foreseeable regulatory framework, was not addressed in the *Riverside* decision.

found to be wrongful and/or reversed) of the license plaintiff seeks. (*See, also* footnote 8 above.)

Moreover, in *MacDonald, Sommer & Frates, et al. v. Yolo County,* 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), the Supreme Court commented on incomplete regulatory action, stating:

> Our cases uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it.

*MacDonald,* 106 S.Ct. at 2567.

The court stated further:

> Most recently, in *Williamson Planning Comm'n. v. Hamilton Bank* [473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126], we held that the developer's failure either to seek variances that would have allowed it to develop the property in accordance with its proposed plat, or to avail itself of an available and facially adequate state procedure by which it might obtain "just compensation," meant that its regulatory taking claim was premature.

*Id.*

In the instant case, plaintiff has failed to use the available statutory provisions for review of agency action to ensure agency consideration of its pending application. Plaintiff would argue that this court should "deem" the long delay in resuming agency proceedings as a "constructive denial" of its application and proceed from that denial to determine whether a taking has occurred.

The events leading to the *Eastport* decision, *supra,* would seem to militate against such an approach. The wrongful delay in

administrative consideration would be more akin to wrongful action than to providing the basis for a "constructive denial" and hence a taking claim.

■ We grant that in particular instances an administrative failure to issue a decision is likened to a denial of the claim. (*See, e.g.,* the Contract Disputes Act of 1978, 41 U.S.C. § 605(c)(5); even there the appellate tribunal has the discretion to stay proceedings to obtain the absent decision.) In most instances, however, this doctrine is used as a basis for an appeal on the merits of the claim being "deemed" as denied. (As if, for instance, plaintiff sought to appeal a "denial" of its application under the AEA (or APA).)

Absent any existing authority supporting plaintiff's argument, and mindful of the *MacDonald* decision, this court declines to employ this approach. It will not "deem" the agency to have denied the application on the merits and then determine whether a taking has occurred on the basis of such denial.

Like the Court in *Williamson* and *MacDonald,* this court would not require plaintiff to appeal the merits of any actual denial of its application (or to exhaust all administrative remedies), but it does require that plaintiff receive a final determination from the agency on plaintiff's application—an action which has not yet been taken.

■ As the Court indicated, in *MacDonald,* the issue of prematurity may be said to go to the jurisdiction of the courts. *MacDonald,* 106 S.Ct. at 2567.[11]

## CONCLUSION

Based on the foregoing, it is concluded that the plaintiff's claim is premature and

---

11. The courts are charged with the fundamental duty of determining the existence and extent of their jurisdiction. In the instant case, the question of the prematurity of plaintiff's complaint is not the only possibly troublesome jurisdictional issue; more basic issues may exist as well.

This case involves alleged violations of the protections of the Fifth Amendment to the Constitution—namely, protection against a governmental taking without payment of just compensation.

Until the mid–1800's, redress of a violation of the Fifth Amendment was available in two

ways: (1) a suit would lie in Article III district courts to prevent, or "undo", any taking not accompanied by just compensation; and (2) a petition could be brought to Congress (*e.g.,* for a private relief bill) to obtain the just compensation due. With the enactment of the Tucker Act (28 U.S.C. § 1491(a)(1)), sovereign immunity was waived and a suit could be brought for the monetary amount of just compensation.

For many years, discussion ensued as to the type of forum upon which such jurisdiction, for money damages, could properly be conferred. The Supreme Court, in *Glidden v. Zdanok,* 370 U.S. 530, at 543, 549, 82 S.Ct. 1459, 1469–72, 8

that therefore this court lacks jurisdiction thereof.

Accordingly, the defendant's motion for summary judgment is GRANTED, and the petition is to be dismissed without prejudice.[12]

Alternatively, in the event that it were to be found that the claim were not premature and/or that this court did have jurisdiction, then, based on the foregoing, it is concluded that plaintiff's complaint does not set forth a claim for compensable taking for which this court can grant relief inasmuch as the property allegedly taken was gener- ated under the existing regulatory system. (In this event, the defendant's motion would likewise be granted, but the complaint would be dismissed with prejudice. See, e.g., RUSCC 41(b) with regard to motions to dismiss for failure to state a claim based on evidence, or facts, as presented by plaintiff only.)

Costs to the prevailing party.

## APPENDIX

### A. Statement of Facts

The first statutory enactment cited by the parties, treating the possession or use

---

L.Ed.2d 671 (and footnote 21), noted suggestions that such jurisdiction must rest in judicial (Article III) courts rather than legislative (Article I) courts. In that decision, the Court also determined that the Court of Claims, then the repository of the Tucker Act jurisdiction over taking claims, was an Article III court. (See, also general discussions in Palmore v. United States, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973) and Northern Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 785 (1982)).

·The Federal Courts Improvement Act of 1982 (Pub.L. 97–164), or FCIA, amended the Tucker Act (28 U.S.C. § 1491(a)(1)) so as to confer jurisdiction for award of money damages for such taking claims in this court. The FCIA also provided that the Claims Court was established under Article I, and its judges serve limited fixed terms. As a waiver of sovereign immunity against suit for money damages, such conferral of jurisdiction is not objectionable. However, given its broader implications, the conferral of jurisdiction may be questionable.

The FCIA did not confer any concurrent jurisdiction in the Article III district courts for the award of money damages. See, e.g., 28 U.S.C. § 1346(a)(1) with respect concurrent Tucker Act jurisdiction over tax-refund cases. (While the decisions of the Claims Court are subject to appeal in the Article III Court of Appeals for the Federal Circuit, the lower court's findings of fact are, under current practice, presumed correct unless shown to be clearly erroneous.) Thus, there is no de novo consideration by an Article III court of suits for just compensation.

Moreover, given the provisions of the current Tucker Act, the district courts may not be permitted to prevent or "undo" takings not accompanied by adequate just compensation. See, e.g., Riverside Bayview, 106 S.Ct. at 460 (and footnote 6). Rather, the exclusive avenue of relief may be under the Tucker Act and hence in this court.

In any event, with respect to "regulatory takings" involving statutes designed to protect the public safety and welfare, it may be more desirable to provide for a monetary remedy to the claimant than to attempt to prevent or "undo" execution of the regulatory action. (See, e.g., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136m; see also Ruckelshaus v. Monsanto Co., 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) and footnote 4 above.)

Thus, with the FCIA's amendment of the Tucker Act, and its creation of the Claims Court, an Article I court may now, apparently, be the sole arbiter (particularly in the resolution of factual issues) of citizens' rights under the Constitution's Fifth Amendment.

Mindful of our responsibility to determine jurisdiction, but also mindful of the axiom that constitutional challenges to statutes (such as the FCIA which unquestionably confers jurisdiction here) are to be avoided unless absolutely necessary, and as a last resort, this court takes an unusual, but not unprecedented, step. Having determined to dismiss the case on other grounds, this court will not address further the basic issues of jurisdiction outlined in this footnote. See, e.g., Travis v. United States, 199 Ct.Cl. 67, at 70 (footnote 1) (1972).

12. During oral arguments, the court suggested that plaintiff may desire to suspend further proceedings here, seek further agency determination on its application, and then supplement its petition to include any new results. (The court indicated that it would nonetheless certify its interlocutory decision for appeal purposes.)

In this way, both its original cause of action and any claim based on the more recent action would remain before the court—eliminating any possible statute of limitations defenses which might possibly otherwise arise. (While the court could not predict that any such defenses would exist, discourses in some professional journals suggest that the issue is not without controversy.)

Plaintiff, however, requested that the court not take this action but, if dismissal is indicated, the case be dismissed outright. This would eliminate any discretion in an appeal from this court's decision. Accordingly, in dismissing this action the court accedes to plaintiff's request.

of nuclear technology or materials by private entities, is the Atomic Energy Act of 1946.[1] Before that time, presumably, there was no statutory regulation and with the passage of that Act such possession or use was severely limited or proscribed.

Shortly thereafter, the Atomic Energy Act of 1954 (the "AEA") was enacted and it is with that statute that this case is now concerned.[2] The AEA altered the policy of the previous statute, and permitted private possession and use of nuclear technology and materials subject to certain regulatory schemes, including the requirement for licensing. (See also the subsequent Private Ownership of Special Nuclear Materials Act of 1964 ("POSNMA").[3]) Also relevant is the National Environmental Policy Act of 1970 ("NEPA").[4]

As provided in the AEA (and the subsequent POSNMA), and to the extent consistent with the NEPA, nuclear materials could be possessed by private entities. Indeed, under the AEA, related government agencies (now the NRC) encouraged the private commercial use of nuclear processes in the generation of electrical power sources and this policy was pursued during the course of at least the next two decades.[5]

An understanding of the facts material to the instant motions requires a slight digression into the field of nuclear-generated electric power and the nuclear fuel cycle.

The nuclear reactors used by electric utilities primarily use enriched uranium dioxide as fuel, and, during the nuclear chain reaction some of this uranium is transmuted into plutonium. When no longer of use to the utility, the fuel is defined as "spent" and is removed from the reactor; the spent fuel contains uranium, plutonium, and waste.

Disposal of this spent fuel may present problems including those incident to the storage of radioactive elements. Accordingly, private commercial enterprises might be further encouraged to use nuclear processes for generating power if the disposal of spent fuel were assumed by the government.

Reprocessing (or "recycling") the spent nuclear fuel, a process sometimes referred to as the "back end" of the fuel treatment, is an alternative to disposal.

Recycling of spent fuel could result in fabrication of new mixed oxide nuclear fuel (by separating the uranium, the plutonium, and the waste) which could in turn constitute a significant new source of energy and conserve the world's uranium supply. One difficulty with such reprocessing, however, is that it results in separation of plutonium from the spent fuel. Plutonium, unlike the enriched uranium, has application not only for nuclear electric power but also nuclear weaponry.

As noted above, the AEA of 1954 and POSNMA of 1964, enabled private concerns to possess and use nuclear fuel in generating power. Possession for the purpose of recycling was also permitted. The government began encouraging research and development in this field in the late 1950's and continued this activity through the mid–1970's.[6]

The AEA required that a construction permit be obtained before building began to assure compliance with various procedures not here in issue. After completion

1. Atomic Energy Act of 1946, 60 Stat. 755 (superseded in 1954).

2. Atomic Energy Act of 1954, 68 Stat. 919, 42 U.S.C. §§ 2011–2282 (1976 and Supp. V. 1981).

3. Private Ownership of Special Nuclear Materials Act of 1964, 78 Stat. 602, codified at 42 U.S.C. § 2012 et seq.

4. The National Environmental Policy Act, Pub.L. 91–190, 83 Stat. 852 (eff. Jan. 1, 1970) 42 U.S.C. § 4321, et seq.

5. Passing reference is also made by the parties to another statute, one enacted after the events here in issue, namely the Nuclear Waste Policy Act of 1982, Pub.L. 97–425, 96 Stat. 2202 (eff. Jan. 7, 1983), 42 U.S.C. § 10101 et seq. ("NWPA").

6. Westinghouse Electric Corp. v. United States, 598 F.2d 759, 762 n. 4 (3d Cir.1979) (a reprocessing plant was built by Nuclear Fuel Services, Inc. in 1960 and operated by it from 1966 to 1971).

of construction, a further license was required permitting operation of the plant and actual fuel reprocessing.

The AEA provided, at 42 U.S.C. § 2133(d), 2134(d), that the government was precluded from issuing a license if such issuance "would be inimical to the common defense and security or the health and safety of the public." A license once granted could be revoked for the same reasons. 42 U.S.C. § 2236(a).

Applications for permits and licenses are made to the Atomic Safety and Licensing Board. (In connection with operating licenses, hearings are held only in contested cases and with respect to matters in controversy.) The decision of the Board is appealable to an Atomic Safety and Licensing Appeal Board, and thereafter is subject to discretionary review by the agency itself. Final orders are directly appealable to the courts of appeals. 42 U.S.C. § 2239(b); 28 U.S.C. § 2343; 10 C.F.R. §§ 2.714, 2.721, 2.786, 2.787.

Plaintiff purchased land at Barnwell, South Carolina, with the intention of constructing a reprocessing plant and applied for a construction permit in 1968. Plaintiff retains title to and use of the land herein involved. In December 1970, when the AEA and NEPA were in effect, plaintiff was granted a construction permit. It began constructing a building facility for the purpose of reprocessing spent nuclear fuel in 1971. The building was completed and plaintiff applied for the operating permit. (In the construction phase, plaintiff incurred a multi-million dollar expense.)

It was in connection with this licensing (for operation) procedure that the controversy arose giving rise to this suit.

Plaintiff contends that the government, notwithstanding and in spite of its early encouragement of the entry of private concerns into the nuclear fuel process and reprocessing, wrongfully abandoned its licensing consideration in 1977 thereby resulting in a taking of plaintiff's property. The focus of the complaint is the government's action (or lack thereof) in 1977 and the processes leading up to it.

The government recognized that the NEPA required the preparation of an environmental impact statement (EIS) concerning any decision to implement a wide-scale program for commercial recycling of spent fuel containing plutonium. In 1974, the government began preparation of such a statement, a Generic Environmental Statement on the Use of Recycle Plutonium in Mixed Oxide Fuel in Light Water Cooled Reactors, referred to as "GESMO".

Concomitant with the GESMO proceedings, the government conducted adjudicatory licensing proceedings on applications by private companies dealing with the construction and operation of recycling plants, including the application for operation of the nearly-completed plant submitted by AGNS.

The agency's first draft of GESMO, in mid–1974, prompted a response from the President's Council on Environmental Quality, noting the failure of the draft to address such concerns as the danger of proliferation and possible safeguards.[7] The agency then promulgated, in November 1975, a policy stating that proliferation risks and safeguards would be included in GESMO, and promulgated procedures for hearings.

The 1975 statement also provided that the agency would consider interim licensing of non-experimental, recycle-related activities. Various environmental groups challenged this procedure and the Court of Appeals for the Second Circuit, in 1976, affirmed the agency's hearing procedures but held that the interim licensing of recycle-related activities on a commercial basis violated NEPA. In view of agency statements in 1977, the Supreme Court vacated and remanded the matter for consideration of mootness. *National Resources Defense*

---

7. In October 1976, President Ford discussed the risks entailed in plutonium recycling and declared that the nation "should pursue reprocessing and recycling in the future only if they are found to be consistent with our international objectives." Statement by the President on Nuclear Power Policy, reprinted in 12 Weekly Comp. of Pres. Doc. 1624, 1626 (1976), as quoted by the court in *Westinghouse,* 598 F.2d at 763.

*Council (NRDC) v. United States Nuclear Regulatory Commission (NRC),* 539 F.2d 824 (2d Cir.1976), vacated and remanded *sub nom. Allied General Nuclear Services v. NRDC,* 434 U.S. 1030, 98 S.Ct. 759, 54 L.Ed.2d 777 (1978).

In April 1977, President Carter disclosed his Administration's policy, noting with alarm the serious proliferation risks of plutonium recycling. The government's response would be to defer indefinitely the commercial reprocessing and recycling of plutonium produced in United States nuclear power programs. The President also announced sponsorship of an International Nuclear Fuel Cycle Evaluation (INFCE) program aimed at developing alternative processes.

Almost immediately, the agency postponed further GESMO hearings and, on May 3, 1977, announced its intention to reassess "the future course and scope of GESMO, the review of recycle-related applications, and the matter of interim licensing." Comments were invited and, on October 4, 1977, a letter submitted on behalf of the President re-emphasized the President's previous comments of April. This letter also suggested accelerated research and development to examine alternative fuel cycles which would not involve direct access to plutonium.

Thereafter, in December 1977, the agency issued an order terminating the GESMO proceedings as well as most proceedings relating to plutonium-recycle license applications. The order also committed the agency to a re-examination of the matter after the completion of the ongoing alternative fuel cycle studies, expected to take about two years. This order was memorialized in a Memorandum of Decision issued on May 8, 1978.

In a series of legal actions, culminating in *Westinghouse,* plaintiff and other interested parties challenged, *inter alia,* the cessation of GESMO and licensing proceedings. At issue was plaintiff's plant, located in Barnwell, South Carolina, for which it had sought an operating license.

In its 1979 decision in *Westinghouse,* 598 F.2d at 770, the Court of Appeals for the Third Circuit described the agency action as follows:

> Essentially, then, the NRC has imposed a moratorium, expected to last about two years, upon its decisionmaking process regarding plutonium recycling, and, as a result, has terminated the pending GESMO and related licensing proceedings.

The court held that the agency did have the authority to impose such a moratorium, stating:

> ... [A]n agency that is invested with such extensive powers to effectuate its far-reaching mandate may impose a moratorium upon its decisionmaking process when sound regulatory reasons exist for doing so....

*Id.* at 772. Such moratoria may be put in place without a prior finding by the agency that the granting of a license would be inimical to the common defense and security or to the health and safety of the public, particularly where a moratorium is itself designed to enable the agency to make reasoned decisions regarding rules and regulations which should be applied in the context of processing license applications. *Id.* at 772.

The court recognized that the administrative body involved in these deliberations was an independent one, and found that the agency preserved that independence, even while considering comments of many interested parties, including the President. As the court stated:

> ... the [agency] is directed in many provisions of the AEA to consider "the common defense and security." Any contemplation of these sensitive matters necessarily touches upon areas that are also within the domain of the President and of Congress. [Footnote omitted]. It was therefore appropriate for the [agency] to take note of the relevant developments in the executive and legislative branches and to ascertain, with the help of interested parties, what bearing these developments may have on its own agenda. As we understand the [agency's] actions here, that is all it did, and it maintained its independence from both those branches while making an in-

formed decision to suspend its proceedings. ... Given this record, we cannot say that the [agency] abused its discretion or acted arbitrarily, capriciously, or not in accordance with the law when it rested its decision in part on a desire not to obstruct the goal of securing international nonproliferation.

*Id.* at 775–76.

The agency published the substance of this exchange and requested public comment on whether the GESMO proceedings should be reopened. 45 *Fed.Reg.* 53933 (August 13, 1980).

While upholding the agency's moratorium, the court also set forth the following important statement:

Of course, the [agency] may not completely terminate license applications proceedings without passing on the merits of the applications, simply by declaring an open-ended moratorium. It is required by statute to fix the conditions and regulations pursuant to which licenses will be granted, and to award such licenses if the prerequisites are met, unless it makes a finding of inimicality to the common defense and security or to the public health and safety. [Footnote omitted].

*Id.* at 774.

The court concluded as follows:

When and if it ever becomes apparent that the [agency] has *de facto* denied the license applications despite the applicants' compliance with the pertinent regulations and without making a finding of inimicality, or that the moratorium is of unreasonable duration, judicial recourse will be available to the aggrieved parties.

*Id.* at 774.

The final nine-volume report of the INFCE Hearings was issued in March 1980. *See* International Atomic Energy Agency *INFCE Summary Volume*, 137–56

(1980). At about the same time, a study was issued concerning an interagency Nonproliferation Alternative System Assessment Program (NASAP).

In May 1980, the agency wrote to a representative of the President noting its commitment to re-examine the applications and resume GESMO proceedings. In July 1980, that representative, Mr. Stuart Eizenstat, advised the agency that the views expressed by the Administration in 1977 were still applicable; that the President believed that the GESMO proceedings should remain terminated; and that a re-opening of GESMO would be inimical to national security and contrary to the nonproliferation and foreign policy interests of the United States.

Some comments were received, but plaintiff only requested an extension of time. This request was denied but the agency stated that it would consider untimely comments to the extent possible. At the time, plaintiff was engaged in discussions with the government concerning the latter's purchase of the Barnwell plant, as discussed below.

From 1977 to 1983, the government, through the Department of Energy, *inter alia,* undertook significant research and development work at plaintiff's Barnwell facility, expending some $100 million during that six-year period. (Notwithstanding that expenditure, AGNS' Barnwell facility was not operated commercially and earned no profit.)

During this period, consideration was also given to using Barnwell as a storage facility, away from reactors, for utilities' spent fuel. Representatives of AGNS and the government also discussed sale of the facility to the government for this purpose in 1980 and 1981.[8]

---

8. In connection with setting a value on the facility for purposes of purchase, at least one government official recommended that an appraisal be based on highest and best use as a reprocessing facility; he also recommended that an appraisal on the cost approach be undertaken, noting the plaintiff's arguments that, but for the government's interference, the facility would have been completed and operated as a reprocessing plant. The official's comments noted also the contention that the Federal Government induced plaintiff to incur the expenses of millions of dollars and then, by excess regulation, destroyed any chance of success of the facility.

In 1981, the new Administration believed it would be inappropriate to purchase the Barnwell facility, and suggested consultation with industry on how to create a more favorable climate for reprocessing by private commercial interests.

In October 1981, President Reagan announced:

> I am lifting the indefinite ban which previous administrations placed on commercial reprocessing activities in the United States. In addition, we will pursue consistent, long-term policies concerning reprocessing of spent fuel from nuclear power reactors and eliminate regulatory impediments to commercial interest in this technology, while ensuring adequate safeguards.

*See* Statement Announcing a Series of Policy Initiatives on Nuclear Energy, 1981 Pub. Papers 903 (Pltf. App. Vol. 1, Tab 99). Notwithstanding this statement, however, the agency has not reopened GESMO or licensing proceedings.[9]

A Department of Energy report in March 1983 characterized the Barnwell facility as capable of commercial operation and reprocessing as a proven technology. (Pltf. App., Vol. I, Tab 82, pp. 8, 41, 42.)[10]

Given the agency failure to reopen GESMO and licensing application procedures

(although plaintiff has not formally requested such reopening or pursued administrative avenues to challenge any refusal to reopen, by explicit decision or implicitly by delay, and to require such reopening), plaintiff filed suit here in March 1983.

### B. *Facts about Government Inducement and International "Bargaining Chips"*

In particular factual areas, the parties are not in agreement, but have stipulated the facts for the purposes of the pending motions and for such purposes only. These particular areas involve (1) Government Inducement and (2) International "Bargaining Chips".

### 1. *Government Inducement*

At the outset of the factual recitation above, it was stated that, beginning with the AEA in 1954, private commercial use of nuclear process was "encouraged". The court in *Westinghouse*, 598 F.2d at 762, n. 4, noted that "the government began encouraging research and development in this field in 1957 ...."

The plaintiff alleges, and defendant, for the purposes of the pending motions, agrees that the government's encouragement may be characterized as vigorous

---

**9.** Moreover, there has, for example, been no administrative implementation of the provisions of the NWPA of 1982, 42 U.S.C. §§ 10101(12) *et seq.,* authorizing the government to accept reprocessed waste in such a way as to encourage reprocessing.

The Department of Energy has declined to establish a system of crediting utilities for reprocessing of their spent fuel. (Pltf. App., Vol. I, Tabs 100, 101.) The Administration has also rejected a 1983 proposal by Bechtel Corporation to utilize the Barnwell facility in a joint venture with the government as a commercial reprocessing demonstration and has agreed to terminate all government research and development projects at that facility. (Pltf. App., Vol. I, tabs 102, 103.)

The government, for the purposes of the instant motions, recognizes the Barnwell facility as capable, on its own, of operating to recycle fuel if granted a license. It points out, however, that in fact, the plaintiff's plant was just one element of a complete fuel cycle industry, all parts of which would have required further licensing by the agency. Casks for the transpor-

tation of spent fuel would need to have been built; plants to fabricate mixed oxide fuel would have to be built and licensed; and operating reactors would have required license amendments to load and use mixed oxide fuel.

The government also notes the regulations of the agency promulgated in 1970 that required that radioactive liquid wastes be solidified within five years of their generation and transferred to a federal waste repository within ten years. This would require plaintiff to complete and secure a license for a waste solidification facility within five years from the time Barnwell began to operate. No federal waste repository for such solid fuel currently exists. However, the NWPA of 1982 establishes a multi-step program for the development of geologic repositories for the disposal of high-level radioactive wastes and spent nuclear fuel, with such facilities probably in operation not before the late 1990's. (*See also* note 5, *supra*.)

**10.** Other private associations, such as the International Energy Associates Ltd., also lauded the Barnwell facility as technologically sound. (*See* Pltf. App., Vol. I, tabs 104, 105.)

and, indeed, amounted to "inducement". As stated by plaintiff:

Without the assurances, land, and technology provided by the Government, AGNS would not have entered the spent fuel reprocessing industry and would not have invested hundreds of millions of dollars to build [its plant]. By 1977, having been coaxed for over twenty years by deliberate and continuing Government inducements and assurances, AGNS had nearly completed the construction of [its plant]. [Plaintiff's brief, at pages 2–3.]

Plaintiff further states, in this connection:

Beginning with the Atomic Energy Act of 1954 and continuing through 1976, the Government induced private industry to assume an obligation which the Government had guaranteed the electric power utilities it would perform—the maintenance of the back end of the nuclear energy [spent] fuel cycle. [Footnotes omitted]. [Pltf. Br., pp. 6–7.]

The underlying motive for the Government's numerous inducements was the mandate of the [Act of 1954] that private enterprise take the leading role in the nuclear industry. As stated in a Senate Report discussing the Act, "[T]he goal of atomic power at competitive prices will be reached more quickly if private enterprise, using private funds, is now encouraged to play a far larger role in the development of atomic power than is permitted under existing legislation". [Footnote omitted]. [Pltf. Br., p. 8.]

In January 1956 the [agency] announced its goal that private industry build plants to reprocess spent nuclear fuel and stated that proposals would be invited for the design, construction and operation of such plants. The [agency] would provide successful applicants access to its laboratories and supply them with initial baseloads of spent fuel. [Footnotes omitted.] [Pltf. Br., p. 9.]

\* \* \* \* \* \*

To importune public utilities to invest in nuclear power to generate electricity, the [agency] guaranteed the back end of the [spent] fuel cycle. In other words it guaranteed utilities that spent reactor fuel would be the responsibility of the [agency].... To relieve itself of this duty, the [agency] continued its program to induce private industry to invest in reprocessing, hoping to create a private sector to handle the spent fuel. [Footnotes omitted]. [Pltf. Br., pp. 9–10].

As plaintiff notes, the industry remained somewhat hesitant and, in April 1957, the agency, at its own invitation, met with plaintiff and other companies. In October 1957, R.W. Cook, the agency's Acting General Manager stated that the agency still expected private industry to reprocess by June 30, 1967.

In addition to the inducements of providing access to government laboratories and guaranteeing baseload quantities of fuel, as described above, further government inducement and assistance is described by plaintiff as follows:

Noting that the use of Government plants to perform reprocessing services over the long term would be undesirable, Cook concluded that "[T]he way is open at any time for industry to build and operate a purely commercial reprocessing facility subject only to the [agency's] licensing requirements." [Footnote omitted].

In furtherance of the mandate of [the AEA], the [agency] established its Office of Industrial Participation in May 1961. [Pltf. Br., pp. 10–11.]

Plaintiff also cites many public statements by agency officials and members of Congress supporting and encouraging the entry of private enterprise into the reprocessing field.

After noting a number of government requests and contracts with the government in related projects, plaintiff notes that it or, more specifically, one of the members of the joint venture, announced its intention of entering the spent fuel reprocessing industry in 1965, in reasonable reliance upon the government's inducements. The government assisted in the formation of the plaintiff entity by suggesting potential partners.

Moreover, plaintiff notes the government's inducements specifically directed to AGNS as follows:

[A predecessor venture was] awarded a five-year contract to manage the Idaho Nuclear Plant. The contract was intended by the [agency] to give Allied reprocessing experience in return for Allied's assurance that it would proceed with plans to construct its own plant. [Footnotes omitted]. [Pltf. Br., p. 16.]

The Government likewise acted to provide land on which [AGNS] could construct a reprocessing plant. In March 1967 [agency] Chairman Seaborg wrote to South Carolina Governor McNair, stating that the [agency] could make land available from the Government's Savannah River Plant (SRP) for a proposed privately owned reprocessing plant. [Footnote omitted]. Arrangements were made in March 1968 among the General Services Administration, the State of South Carolina, and the County of Barnwell for the Government to transfer a portion of the SRP property to Barnwell County, which in turn was to convey the site to [AGNS] for the express purpose of constructing [its reprocessing plant] BNFP. [Pltf. Br., pp. 18–19.]

As plaintiff points out, statements of agency officials continued to encourage, and indeed look forward to, entry of private industry into the spent fuel reprocessing field. Officials communicated this desire to AGNS directly, as well. In April 1975, the Energy Research and Development Administration (ERDA) contracted with AGNS to lend AGNS uranium oxide which was to be used in the start-up of plaintiff's plant and then returned to the government (in reprocessed form).

In sum, the government did encourage the entry of private industry, and AGNS in particular, into this field. The degree of encouragement was indeed vigorous and continual.

As defendant notes, however, the industry, and the predecessor companies combining to form the plaintiff AGNS, were highly competent and fully versed, and entered into this endeavor of their own free will as a business venture.

### 2. *International Bargaining Chips* [11]

As suggested in the text above, the agency decision to suspend the GESMO hearings was the result of information it had received from the Administration concerning the dangers of international proliferation.[12] Also transpiring were India's atomic test in 1974, using plutonium recovered from an Indian reprocessing plant, and in 1976 and 1977 the French and West German nuclear industries were negotiating to sell reprocessing technology to Brazil and Pakistan.

Concern over proliferation was echoed in an agency announcement in May 1978, as follows:

... [I]f the United States were to deny other nations the right to reprocess while continuing to pursue commercial reprocessing at home, it would undermine the credibility of our concern about the use of plutonium and our international initiatives towards non-proliferation.

43 *Fed.Reg.* 20575, May 1978.

At the time, the private commercial nuclear reprocessing was represented principally by plaintiff's Barnwell plant which was being constructed and was eligible for issuance of an operating permit. However, the government, at that time and to date, has operated a reprocessing plant known as the Savannah River Plant in the same area where plaintiff's Barnwell plant was located.

---

**11.** In connection with this matter, if the case is not resolved on the dispositive motions, for which purpose defendant has agreed to the facts as alleged by plaintiff, the facts are not only controverted but, for their resolution, extensive discovery has been outlined by plaintiff, much of which is objected to by defendant as involving executive privilege, sensitive foreign policy matters, and on many other grounds.

**12.** Such concerns were recognized in the Treaty on the Non-Proliferation of Nuclear Weapons of July 1, 1968, as well as the Nuclear Non-Proliferation Act of 1978, Pub.L. 95–242, codified at 22 U.S.C. §§ 3201 *et seq.*

The advice and information furnished by President Carter in 1977 and thereafter, and the agency's response thereto, have been summarized above.

The plaintiff, in its brief at page 34, characterizes these events as follows:

> ... the Government had sacrificed domestic commercial reprocessing, namely [plaintiff's plant], solely as a bargaining chip for international diplomacy and without any domestic health and safety rationale.

For the purposes of the pending motions, the parties would agree that domestic commercial reprocessing, particularly as it affected operation of plaintiff's plant for which application was pending, was a "bargaining chip" in international negotiations.

Apart from the bargaining chip considerations of nuclear proliferation, no findings have been issued to date, either administratively or in the courts, concerning any ways in which the operation of plaintiff's plant would be inimical to the public health and safety or to the common defense and security.

However, it is also unquestioned that the court in *Westinghouse* found that, as part of the administrative process, it was appropriate, in the interests of common defense and security, for the agency to take note of relevant developments in the executive and legislative branches concerning proliferation and that the agency had not abused its discretion in determining to suspend consideration of plaintiff's application for this purpose.